Filed 8/8/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MELONY LIGHT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF PARKS AND RECREATION et al.,<br><br>    Defendants and Respondents. | D070361<br><br><br><br>(Super. Ct. No. 37-2013-00069437-CU-OE-CTL) |

APPEAL from judgments of the Superior Court of San Diego County, Richard E.L. Strauss, Judge.  Affirmed in part; reversed in part.

Stewart and Musell, Wendy E. Musell and Elisa J. Stewart for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Chris A. Knudsen, Assistant Attorney General, Christine Mersten and Jodi L. Cleesattle, Deputy Attorneys General, for Defendant and Respondent California Department of Parks and Recreation.

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III and V.

Simpson Delmore Greene, Terence L. Greene, and Elizabeth A. Donovan for Defendant and Respondent Kathy Dolinar.

Savage Day and Kelly Savage Day for Defendant and Respondent Leda Seals.

Plaintiff Melony Light appeals judgments in favor of her employer, defendant California Department of Parks and Recreation (Department), and her former supervisors, defendants Leda Seals and Kathy Dolinar, following orders granting defendants' motions for summary judgment. Light contends the trial court erred by summarily adjudicating her claims against the Department for retaliation, disability discrimination, and failure to prevent retaliation and discrimination, all in violation of the Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.).[1] She also contends the trial court erred by summarily adjudicating her claims against Seals for intentional infliction of emotional distress and assault and summarily adjudicating her claim against Dolinar for intentional infliction of emotional distress. The court also summarily adjudicated an additional claim against Seals, for false imprisonment, but Light does not challenge that ruling in this appeal.

As to the Department, we conclude triable issues of material fact preclude summary adjudication of Light's retaliation claim, but not her disability discrimination claim. Light's claim against the Department for failure to prevent retaliation or discrimination therefore survives based on Light's retaliation claim. As to Seals and Dolinar, we conclude contrary to the trial court that workers' compensation exclusivity

---

[1] Further statutory references are to the Government Code unless otherwise indicated.

does not bar Light's claim for intentional infliction of emotional distress under the circumstances here. However, as to the merits of that claim, we conclude Light has raised a triable issue of fact only as to Seals, not Dolinar. We further conclude Light has raised triable issues of fact on her assault claim against Seals. We will therefore affirm in part and reverse in part the judgments in favor of the Department and Seals, and we will affirm in full the judgment in favor of Dolinar. Because our discussion of the interplay between workers' compensation exclusivity and intentional infliction of emotional distress addresses an important legal issue, and our interpretation differs from a recent opinion by our colleagues in Division Three of this court, we will publish that discussion, as well as our discussion of the FEHA retaliation claim on which it relies. Because our discussions of Light's FEHA disability discrimination and assault claims raise no similar issues, they remain unpublished.

FACTUAL AND PROCEDURAL BACKGROUND

Consistent with our standard of review of orders granting summary judgment, we will recite the historical facts in the light most favorable to Light as the nonmoving party. (See *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) Additional facts will be discussed where necessary in the next section.

In April 2010, Light began working as a seasonal Park Aide at the Department's Ocotillo Wells District in San Diego County. She was laid off during the summer months (July through September), which constitute the low tourist season due to the summer desert heat. In the fall, Light was rehired as a senior seasonal Park Aide. In January

3

2011, Light was promoted to a permanent position as an Office Assistant, also at the Ocotillo Wells District.

Light's position as an Office Assistant was classified as "intermittent," i.e., she was not guaranteed full-time, regular hours. Under normal circumstances, she was limited to a total of 1500 working hours per year. She could, however, exceed that limit with Department authorization. Light was laid off during the summer months again in 2011 because it was the low season.

Seals was the Administrative Officer of the Ocotillo Wells District and Light's supervisor. Dolinar was the Superintendent of the Ocotillo Wells District and Seals's supervisor. Seals and Dolinar were close friends.

A month after Light returned in fall 2011, Seals recommended Light for an "out-of-class" assignment as an Office Technician. An "out-of-class" assignment is a temporary assignment to a position in a higher classification with an accompanying increase in pay. The assignment was scheduled to last for approximately four months or until the incumbent employee returned from medical leave. Light served the full four months in the out-of-class assignment as an Office Technician. Before the end of that assignment, in approximately February 2012, Seals recommended Light for a second out-of-class assignment as a Management Services Technician. Light's second out-of-class assignment was scheduled to last through May 2012. During that time, Light also received a pay raise in her regular Office Assistant classification.

Light was friends with a coworker, Delane Hurley. Seals believed Hurley to be a lesbian. Seals repeatedly made comments to Light intended to make her uncomfortable

4

about her friendship with Hurley, to enlist Light in Seals's harassment of Hurley based on her sexual orientation, and to encourage Light to cease all contact with Hurley. Seals's actions caused Light to suffer emotional distress.

Hurley eventually took medical leave for stress. While she was absent, Seals asked Light to go through Hurley's workspace and remove any personal items. Light objected because she did not feel comfortable going through Hurley's things, but Seals insisted. Seals also told Light to move into Hurley's office because Hurley would not be coming back to the District. Light again objected, but Seals told her the move was nonnegotiable. During this process, Light found what appeared to be a gun scope. Seals told Dolinar Light feared for her safety because of potential retaliation from Hurley, but that was not true. Light had no such fears. Light was only concerned Hurley would believe Light was part of the effort to discriminate against her when she found out Light had moved offices. Light told Dolinar directly she had no fears for her safety.

Dolinar, however, invited a counselor to the office to address conflicts between Hurley and other employees, including alleged safety issues raised by the gun scope incident. Hurley was supposed to be present, but she did not attend. Light attended, as did Seals, Dolinar, and other employees. The meeting turned into a discussion about what a terrible employee Hurley was, how she had destroyed trust in the workplace, and how she had terrorized management and employees. Light was afraid to tell her side of the story, which was supportive of Hurley. She attempted to stay and talk with the counselor alone, but Seals and Dolinar remained in the room.

5

Hurley filed a complaint with the Department's Human Rights Office alleging sexual harassment; discrimination based on sex, sexual orientation, and marital status; and retaliation. She made specific allegations against Seals. After Hurley's allegations, the atmosphere in the Ocotillo Wells District office where Light worked was toxic and stressful, with employees in the District office isolated from other employees. Light attempted to talk with Dolinar about Hurley's treatment by Seals and other managers, but Dolinar covered her ears and said "I don't want to know" or "I don't want to hear anything about anything."

The Department's Human Rights Office sent investigators to the Ocotillo Wells District in January 2012 to assess Hurley's allegations. Before Light met with investigators, Seals told Light she and Dolinar expected Light and other employees to lie to the investigators. Light was expected to be on Dolinar's "team" and protect her supervisors. Seals said, "If you're not on [Dolinar's] team, your career will be over. If you don't protect [Dolinar], [and Dolinar's] staff, then your career will be over. [Dolinar] will see to it that your career will be over." Seals went to another employee, Kathryn Gravett, and told her to lie as well. Seals told Gravett, "I need to ask you a favor. This is the time for you to show team support." Seals wanted Gravett to tell the investigators that one of Hurley's allegations of harassment, which Gravett had witnessed, was not true. Seals indicated it would be in Gravett's best interest to support her and Gravett might suffer retaliation or punishment if she told the truth. Seals also told Gravett that Dolinar would receive a report of everything Gravett told investigators.

In later deposition testimony, Seals admitted warning Gravett (as well as Hurley herself) that going against management could have adverse consequences: "I have seen that retaliation existed in [the Department]. So I would choose not to go up against managers because I had gone up against a manager in a time frame, and I paid a pretty heavy price for it. So in my opinion, I have found that it wasn't worth it." Seals explained going against management could leave an employee "isolated a little bit." Seals also admitted asking Gravett not to volunteer certain things to investigators.

Light met with the Human Rights Office investigators. The weekend afterwards, Seals called Light at home. Light did not pick up the phone because she had been warned by Gravett that Seals would want to talk about her interview with the investigators. (Seals contacted Gravett and other employees after their interviews to find out what was discussed; Gravett lied to Seals and downplayed what she had said to the investigators.) The following Monday, Seals called Light into her office. She talked generally about work and then asked Light how the interview had gone. Light responded, "It was one of the most debilitating experiences of my life, one that I hope not to repeat." Seals gave Light a big hug and said she had put a "tremendous burden" on Light and asked her to perform "beyond the call of duty." She said, "And you've been there for me, and I just want you to know how much I appreciate that." Seals kissed Light on the cheek. Light interpreted Seals statements as irony, and she felt that Seals's kiss was "the kiss of death."

Seals began to distance herself from Light. In mid-February, Seals recommended that Light be moved from the Ocotillo Wells District office, where she worked, to the

7

Visitor Services office. Dolinar told Light about the move. Light was unhappy and communicated her displeasure to other employees.

On February 23, Seals called Light into her office and closed the door. She accused Light of "cut[ing] her down" to other employees. Seals raised her voice and was very animated. She leaned toward Light in a threatening manner and, in Light's view, was "full of rage." Seals recounted Light's history at Ocotillo Wells and verbally abused her. Seals said she should not have hired Light or given her out-of-class assignments. Light did not "fit in" and did not follow orders. Light asked Seals to identify problems with the substance of her work, but Seals could not do so.

Seals said Light's last day of work at Ocotillo Wells would be May 30 and, until then, she would work in Visitor Services. She said Light would fit in at Visitor Services because the park rangers there did not follow orders either.

Light was very upset. She tried to leave Seals's office, but Seals blocked her way. At some point, Seals stepped away and Light walked to her office. Seals followed. Light entered her office and tried to shut the door, but Seals pushed the door open. The door hit Light and caused her to step backwards. Seals put her foot in the door and continued to try to talk to Light. Seals asked if Light wanted to talk with anyone, but Light said she wanted to be alone. Seals eventually let Light close the door.

The Public Safety Superintendent, Kirk Shea, came to Light's office. Shea said Seals had contacted him. He led Light outside so she could recover. Light told Shea that Seals had attacked her and gave him a general description of the incident. Shea left Light to talk with Seals again, and Light went to the Visitor Services building. Light talked

8

with two other employees there, but she could not stop crying. She wanted the contact information for the Human Rights Office investigators so she could report Seals. Park rangers who witnessed the aftermath of the incident described Light as very distraught, crying, and having difficulty speaking.

Shea came back to see Light. Shea said Light had misunderstood Seals. Shea said Seals "doesn't have a malicious bone in her body." Light explained to Shea her history with Seals, the pressure on Light to lie, and the reason for Seals's confrontation. Shea warned Light to be careful about what she said. Light went to her car, talked with another employee for a while, and went home.

That night, Light spoke with Gravett and told her about the incident with Seals. The next day, Seals spoke with Gravett as well. Seals complained that Light had betrayed her and "knif[ed] her in the back" because she would not tell Seals what she told the Human Rights Office investigators. Later Seals called Gravett and told her not to have any contact with Light. Dolinar was in the car with Seals during this conversation.

In March 2012, Light filed her own complaint with the Department's Human Rights Office. Light alleged Dolinar had retaliated against her for cooperating with the investigation into Hurley's complaint. Light later added Seals, Shea, and other individuals to the complaint. When the investigation concluded, two years later, it found true several allegations of retaliation against Light as a result of her participation in Hurley's complaint, including that Seals asked Light about the content of her interview with investigators and Seals "verbally attacked" Light during the February 23 incident. It also found true the following allegations: "Through your interview process you alleged

9

that Dolinar was retaliatory in her actions as a manager for the [Ocotillo Wells] District. You alleged that Dolinar was directly responsible for building and allowing a retaliatory culture at [Ocotillo Wells]. The retaliatory culture encouraged and enabled supervisors/managers to retaliate."[2]

Seals was placed on administrative leave in early March. Although there remained a possibility she would return to the Ocotillo Wells District for some months thereafter, she never returned to work there. Eventually she retired from state employment.

Dolinar took over Seals's responsibilities as acting Administrative Officer. She told Light she would not be receiving previously promised training for an Office Technician position in the Law Enforcement and Emergency Services (LEES) division at the District. Dolinar said the Department had put out an advertisement to hire for the position, and because of budget issues only the new hire would be trained. Around this time, funding for Light's Office Assistant position appears to have been eliminated from the Department's budget, although it is unclear whether this fact was communicated to Light.

Light applied for the LEES Office Technician position. In April, she participated in an interview before a panel consisting of Shea and two other employees. In early May, Light received a memorandum from Shea. The memorandum informed Light she had not

_____

[2]     The Department considers an allegation substantiated "if the investigation uncovers sufficient supporting evidence that the events occurred as alleged, and were a violation of Department [Equal Employment Opportunity] policies."

been selected for the LEES Office Technician position. The memorandum stated, "With the filling of this position, there are no vacant administrative positions available in the LEES section. As such, your last scheduled work day in your position will be May 30, 2012. As you are a permanent intermittent employee, you will remain on the books as an Office Assistant PI in the Administrative section. Until the District funding and workload allows, no hours will be scheduled for that position. If Office Assistant work is needed in the Administrative section in the future, the District will contact you and make arrangements for your return to work."[3]

The Department made an offer to another applicant for the LEES Office Technician position, but it ultimately withdrew the offer. The Department did not select another applicant, and it held the position open despite earlier describing it as a "mission critical position." It was re-advertised and filled in spring 2014.

Approximately a week before Light's last scheduled work day, she went on medical leave and sought workers' compensation for anxiety, nausea, loss of appetite,

---

[3] Around the same time, Dolinar sent an e-mail to all Ocotillo Wells District employees announcing that the Department continued to face budget issues. Employee hours would be reduced, and employees not scheduled to work in the summer would no longer be able to use leave credits to cover the minimum number of hours needed to retain health care and other benefits. Although Light acknowledges the e-mail was sent to all employees, she alleges these cuts and other restrictions were unevenly enforced, falling primarily on perceived "troublemakers" like herself. In the trial court, Light sought judicial notice of various documents purporting to show the Department did not have genuine budget issues. The trial court denied Light's request for judicial notice. Although Light claims the trial court erred by denying judicial notice, Light does not seek judicial notice of these documents in this court. (See Cal. Rules of Court, rule 8.252(a)(1) [requests for judicial notice must be made by "separate motion"].) We therefore will not consider them.

11

migraines, asthma attacks, body aches and pains, digestive problems, vomiting, severe abdominal cramps, and tightness in the chest. She alleged she had suffered "continuous" injury since January 2011. In June, Light submitted a claim to the State Compensation Insurance Fund for similar injuries based on the February 23 incident. She eventually received a worker's compensation award of $12,765.

Light was on medical leave in June, July, and August 2012. During this time, Light applied for a Staff Services Analyst position with the Coachella Valley Mountains Conservancy. She was interviewed in September. A member of the interview panel mentioned that she knew Seals and had spoken with her in the past two weeks. The interviewer wanted to know what had happened at Ocotillo Wells. Another interviewer repeatedly said they did not want any "drama" or "trouble" at their workplace. Light had the impression they knew Light had been labeled a troublemaker by management at the Ocotillo Wells District. Light later said her interview performance had been "substandard" based, in part, on the connections to Seals. Light was not selected for the position.

In late September, Light e-mailed the Department about returning to work. Light wrote that her Human Rights Office complaint and workers' compensation claim resulted from the "hostile work environment" at the Ocotillo Wells District. Light requested reassignment to a different workplace because conditions at Ocotillo Wells had not changed. She also requested a position in a higher classification than she previously held: Administrative Officer, Associate Government Program Analyst, or Staff Services

12

Analyst. Light explained that she had been wrongfully denied promotional opportunities and was therefore entitled to a higher position when she returned to work.

Light included a report from her psychologist. He wrote, "[Light] is no longer disabled but cannot return to her original job site because of threats of retaliation made to her there by her supervisor." He diagnosed Light with posttraumatic stress disorder (PTSD) and panic disorder.

The Department responded with the news that Dolinar had been removed from her position at the Ocotillo Wells District. She had been placed on administrative leave and retired a few months later. The Department asked whether Light would be willing to return to Ocotillo Wells. Light said she would consider returning if the retaliation ceased, and she inquired about a position in a higher classification. The Department responded that they could not offer Light a more senior position but were seeking a position in Light's existing classification (Office Assistant, Permanent Intermittent) somewhere in southern California. The Department also requested further documentation from Light's psychologist.

Light submitted a "Reasonable Accommodation Request" in November. She identified the following as the "limitation that requires accommodation": "Physical and mental limitations such as anxiety, panic attacks, post-traumatic stress disorder, and depression are symptoms associated with returning to [Ocotillo Wells's] hostile work environment and facing continued retaliation from supervisors and co-workers." She described, as her requested accommodation, the following: "Return to Ocotillo Wells [District] with assurance that it ceases to be a hostile work environment and retaliation no

13

longer exists between supervisors and employees. Or, return to a new location." Light's psychologist provided a letter in support of the request. He wrote that he treated Light for PTSD "relating to a hostile work environment and threats to her by supervisors, with symptoms of depression, acute anxiety, and panic attacks." He supported her requested accommodation.

A month later, the Department offered Light the choice of two Office Assistant positions, one in the Ocotillo Wells District and one in the San Diego District. If Light chose San Diego, the Department offered to pay her reasonable moving expenses. Light sought further information about the positions, including the hours she could expect to work and the work duties. Light was concerned that she would not work full-time during the high season at Ocotillo Wells. A manager at Ocotillo Wells informed Light that after a month of work she may not have any hours scheduled due to budget issues. She also informed Light she could expect a maximum of 25 hours per week. Although Light had concerns about hours and work conditions, she accepted the Ocotillo Wells position and returned to work at the end of December.

Approximately a year after her return to work, Light was promoted to Office Technician. A year and a half later, Light was promoted to Staff Services Analyst, a permanent, full-time position. She has also received merit pay increases. At the time of the underlying litigation, Light remained employed by the Department at the Ocotillo Wells District.

Light filed this lawsuit after she returned to work. She alleged numerous claims against the Department, Seals, and Dolinar, including retaliation, harassment, disability

14

discrimination, assault, false imprisonment, negligent infliction of emotional distress, and intentional infliction of emotional distress. The trial court disposed of several claims at the pleading stage. After two and a half years of litigation, the Department, Seals, and Dolinar moved for summary judgment on the remaining claims against them. The court granted the motions.

Light's remaining claims against the Department were for disability discrimination, retaliation, and failure to prevent discrimination or retaliation. On the first claim, while the court found a triable issue of fact whether Light had a mental disability, it concluded the undisputed facts showed (1) the Department had reasonably accommodated the disability, (2) the Department adequately engaged in an interactive process regarding accommodation, and (3) the Department did not take any adverse employment action against Light following notification of her disability. On the second claim, for retaliation, the court found the Department had shown legitimate nonretaliatory reasons for any potential adverse actions, including changes in Light's job duties, the denial of training, the failure to promote her to LEES Office Technician, and her layoff at the end of May 2012. The court found Light had not raised a triable issue of fact on the issue of intentional retaliation for any of these potential adverse employment actions. On the third claim, for failure to prevent discrimination or retaliation, the court concluded it must fail because Light had not raised a triable issue of fact regarding any actionable discrimination or retaliation.

The remaining claims against Seals were for assault, false imprisonment, and intentional infliction of emotional distress. The assault and false imprisonment claims

15

were based on the February 23 incident between Seals and Light.  The trial court found the undisputed facts showed that Light was not subjected to a threat from harmful or offensive touching, an essential element of assault, and therefore could not maintain that claim.  It also found Light had not been confined in Seals's office for any length of time, without her consent, so her claim of false imprisonment must fail as well.[4]  As to Light's claim for intentional infliction of emotional distress, the court found that Light's exclusive remedy was through the workers' compensation system.  To the extent Light alleged retaliatory actions that might be outside the scope of that system, the court's determination that no retaliation had occurred precluded application of that exception.

The only remaining claim against Dolinar was for intentional infliction of emotional distress.  The trial court found that Dolinar was entitled to summary adjudication of this claim for the same reasons as for the same claim against Seals.

The trial court entered judgments against Light, and in favor of each defendant, in accordance with its prior orders.  Light appeals.

DISCUSSION

I

*Standard of Review*

We review de novo the trial court's orders granting defendants' motions for summary judgment.  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).)  "A defendant's motion for summary judgment should be granted if no

---

[4]    As we have noted, in this appeal Light does not challenge the ruling on her claim for false imprisonment.

16

triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. [Citation.] The burden of persuasion remains with the party moving for summary judgment. [Citation.] When the defendant moves for summary judgment, in those circumstances in which the plaintiff would have the burden of proof by a preponderance of the evidence, the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' " (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002–1003 (*Kahn*).)

"If the defendant 'carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.' [Citation.] 'The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action. . . .' " (*Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1497 (*Schmidt*).)

"[T]o determine whether there is a triable issue, we review the evidence submitted in connection with summary judgment, with the exception of evidence to which objections have been appropriately sustained." (*Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor

17

of that party."  (*Yanowitz, supra*, 36 Cal.4th at p. 1037.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

## II

### *Retaliation*

### A

Light contends the trial court erred by summarily adjudicating her claim for retaliation under FEHA.  That statute declares it to be an unlawful employment practice "[f]or any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  (§ 12940, subd. (h).)  "[I]n order to establish a prima facie case of retaliation under FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action."  (*Yanowitz, supra*, 36 Cal.4th at p. 1042.)  The requisite "causal link" may be shown by the temporal relationship between the protected activity and the adverse employment action.  (*Arteaga v. Brink's Inc.* (2008) 163 Cal.App.4th 327, 356; *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615.)

18

"Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz, supra*, 36 Cal.4th at p. 1042.)

B

The Department argued, and the trial court agreed, that Light could not establish a prima facie case of FEHA retaliation because she did not suffer any adverse employment actions. "In order to meet the FEHA standard, an employer's adverse treatment must 'materially affect the terms, conditions, or privileges of employment.' [Citation.] '[T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim.' [Citation.] Such a determination 'is not, by its nature, susceptible to a mathematically precise test.' [Citation.] 'Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h).' [Citation.] FEHA not only protects against 'ultimate employment actions such as termination or demotion, but also the entire spectrum of

19

employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement. . . .' " (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 298–299; see *Yanowitz, supra*, 36 Cal.4th at pp. 1052, 1054–1055.)[5]

" 'A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient.' [Citation.] ' "[W]orkplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." ' " (*McRae v. Department of Corrections and Rehabilitation* (2006) 142 Cal.App.4th 377, 386.) For example, " '[a] mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action under the FEHA.' " (*Pinero v. Specialty Restaurants Corp.* (2005) 130 Cal.App.4th 635, 646.) Similarly, "[m]ere ostracism in the workplace is insufficient to establish an adverse employment decision. [Citation.] However, ' "[W]orkplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for . . . retaliation cases." ' " (*Kelly v. Conco Cos.* (2011) 196 Cal.App.4th 191, 212.)

---

5    Light urges this court to adopt the standard for identifying an adverse employment action under federal antiretaliation law. That standard focuses on the deterrent effect of the employer's conduct. (See, e.g., *Thompson v. North American Stainless, LP* (2011) 562 U.S. 170, 174.) The California Supreme Court in *Yanowitz* rejected the deterrence standard for FEHA claims (*Yanowitz, supra*, 36 Cal.4th at p. 1050), and we are bound by its interpretation (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455).

When a plaintiff alleges a series of actions that comprise a course of conduct, we need not examine each individually. Instead, we consider the totality of the circumstances to determine whether the plaintiff has suffered an adverse employment action. "[T]here is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries. [Citations.] Enforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute." (*Yanowitz, supra*, 36 Cal.4th at pp. 1055–1056.)

Viewing the evidence in the manner most favorable to Light, we conclude she has raised a triable issue of material fact, i.e., a reasonable trier of fact could conclude Light suffered an adverse employment action by the Department following her participation in Hurley's discrimination complaint. (See *Aguilar, supra*, 25 Cal.4th at p. 850.) After Light was interviewed by investigators, and refused to tell Seals what they had discussed, Seals isolated Light, moved her to a different office, verbally and to some extent physically attacked her during the February 23 confrontation, and told her she would no longer work at the Department when her current out-of-class assignment was over. Dolinar rescinded her offer to train Light for the LEES Office Technician position, and Light was later rejected for promotion to that position despite having served as an Office Technician (in an out-of-class assignment) for a number of months. The Department ultimately left the position vacant, despite earlier classifying it as a "mission critical position." The Department then reduced Light's scheduled hours to zero (as Seals had threatened), having eliminated funding several months prior. Taken together, this

21

evidence could lead a reasonable trier of fact to conclude that Light's employment had been materially and adversely affected. Indeed, in the end, Light's employment was effectively suspended because the Department did not schedule any hours for her. Even setting aside the other actions, the reduction of Light's hours alone could constitute a material and adverse employment action by the Department.

The Department disagrees with Light's assertion that she was "fired" and argues her reduction in hours was a normal seasonal occurrence. But even accepting the Department's view that Light was not "fired," her scheduled hours were reduced to zero. That action may reasonably be interpreted as a material and adverse change in Light's employment. The Department's assertion that it had nonretaliatory reasons for the reduction in hours (i.e., normal seasonal fluctuations in hours) is irrelevant to the issue of whether it was an adverse employment action. We will consider the question of motivation in the next part.

The Department also points out Light's employment with the Department has continued and she has subsequently received promotions and pay raises. But those promotions and pay raises, while they may ultimately be relevant to the issue of damages, do not mean Light's employment was not materially and adversely affected by the Department's earlier actions. Moreover, contrary to the Department's assertion, the denial of previously promised training and the failure to promote may constitute adverse employment actions under circumstances such as those present here. (See *Taylor v. City of Los Angeles Dept. of Water and Power* (2006) 144 Cal.App.4th 1216, 1232.) The trial court erred by concluding the Department was entitled to summary adjudication of

22

Light's retaliation claim on the ground that she had not raised a triable issue of material fact on the issue of the existence of an adverse employment action.

C

The Department alternatively contends it offered legitimate, nonretaliatory reasons for any adverse employment actions and Light has not raised a triable issue of fact regarding retaliatory intent.  The Department relies on evidence that Light's help was needed in the Visitor Services office because the District office did not have enough work, budget issues caused Dolinar to deny previously promised training, Light did not perform well in the interview for the LEES Office Technician position, and Light's reduction in hours was a normal seasonal fluctuation caused by the low tourist season.

We will assume without deciding that the Department has offered legitimate, nonretaliatory reasons for its adverse employment actions against Light.  We therefore will not presume retaliatory intent, and Light has the burden of offering evidence sufficient to raise a triable issue of fact regarding intentional retaliation.  (See *Yanowitz, supra*, 36 Cal.4th at p. 1042.)  To do so, Light must offer evidence sufficient to allow a trier of fact to find either the Department's stated reasons were pretextual or the circumstances " 'as a whole support[] a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus.' "  (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1226 (*Joaquin*).)

The showing of pretext, while it may indicate retaliatory intent or animus, is not the sole means of rebutting the employer's evidence of nonretaliatory intent.  " 'While "pretext" is certainly a relevant issue in a case of this kind, making it a central or

necessary issue is not sound. The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus. The employer's mere articulation of a legitimate reason for the action cannot answer this question; it can only dispel the *presumption* of improper motive that would otherwise *entitle* the employee to a judgment in his favor. Thus, citing a legitimate reason for the challenged action will entitle the employer to summary judgment only when the employee's showing, while sufficient to invoke the presumption, is *too weak* to sustain a reasoned inference in the employee's favor. That, and not "pretext," must be the focus of the judicial inquiry.' " (*Joaquin, supra*, 202 Cal.App.4th at p. 1226, fn. 5, quoting *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 715.) For example, a mere temporal relationship between an employee's protected activity and the adverse employment action, while sufficient for the plaintiff's prima facie case, cannot create a triable issue of fact if the employer offers a legitimate, nonretaliatory reason for the adverse action. (*Arteaga v. Brink's, Inc., supra*, 163 Cal.App.4th at p. 357.)

Although a temporal relationship alone is insufficient, other circumstantial evidence of retaliatory intent may be enough to avoid summary judgment. "Proof of discriminatory intent often depends on inferences rather than direct evidence. [Citation.] And because it does, 'very little evidence of such intent is necessary to defeat summary judgment.' [Citation.] Put conversely, summary judgment should not be granted unless the evidence cannot support any reasonable inference for plaintiff." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 283 (*Nazir*).)

24

Here, even setting aside the issue of pretext, a reasonable trier of fact could find the Department's adverse employment actions against Light were the result of retaliatory intent or animus. Seals warned her employees that Department management engaged in retaliation. Seals showed contempt for the Department's policies when she asked her employees to lie to Human Rights Office investigators and followed up to see whether they had complied. Seals explicitly threatened Light with retaliation if she did not support Dolinar. During the February 23 confrontation, Seals told Light she did not follow orders, she would be moved to a different workplace, and her work at the District would end. A later report by the Department's Human Rights Office found Dolinar had built and allowed a retaliatory culture at Ocotillo Wells, which enabled supervisors and managers to engage in retaliation. This evidence is not merely circumstantial; it is direct evidence the Department intended to and did retaliate against Light for participating in Hurley's complaint.

The Department does not persuasively address this evidence. Instead, it focuses on whether Light showed pretext and whether Light's own subjective feelings of retaliation were sufficient to defeat summary judgment. As we have explained, the Department's focus on "pretext" as the central issue is misplaced. (See *Joaquin, supra*, 202 Cal.App.4th at p. 1226, fn. 5.) And, whatever the evidentiary value of Light's own feelings, those feelings were not the exclusive evidence of retaliatory intent. Light has offered sufficient evidence to raise a triable issue of fact on this issue as well.

The trial court therefore erred by concluding the Department was entitled to summary adjudication of Light's retaliation claim on this ground as well. Because no

25

other grounds for summary adjudication of this claim have been asserted, we will reverse the trial court's judgment as to this claim. We will also reverse the trial court's judgment as to Light's claim for failure to prevent retaliation or discrimination, as its summary adjudication was entirely derivative.

## III

### *Disability Discrimination*

#### A

Light also contends the trial court erred by summarily adjudicating her claim for disability discrimination under FEHA. The statute forbids any employer from "discriminat[ing] against [any] person in compensation or in terms, conditions, or privileges of employment" based on a physical or mental disability. (§ 12940, subd. (a).) It also makes it unlawful for any employer to "fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee" (§ 12940, subd. (m)(1)) or to "fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." (§ 12940, subd. (n).) Light pursued all three FEHA theories in the trial court. We will examine each in turn below.[6]

---

[6] In the trial court, the Department argued Light was not disabled under FEHA. (See *Higgins-Williams v. Sutter Medical Foundation* (2015) 237 Cal.App.4th 78, 84.) The court found Light had raised a triable issue of fact as to the existence of a disability, although it determined summary adjudication was warranted for other reasons. On appeal, the Department urges us to consider this ground as an alternative basis on which

26

As context, Light's claimed mental disability was PTSD and panic disorder as a result of retaliation and other hostile actions by supervisors at the Ocotillo Wells District. Her requested accommodation was the following: "Return to Ocotillo Wells [District] with assurance that it ceases to be a hostile work environment and retaliation no longer exists between supervisors and employees. Or, return to a new location."

                                        B

As with a claim for retaliation, a claim for disability discrimination under section 12940, subdivision (a) requires a plaintiff to show an adverse employment action. (*Scotch v. Art Institute of Cal.-Orange Cnty., Inc.* (2009) 173 Cal.App.4th 986, 1004 (*Scotch*).) The plaintiff must also show as part of its prima facie case that the circumstances suggest a discriminatory intent. (*Ibid.*) But, as with retaliation, the plaintiff need not prove causation directly. A plaintiff may show, for example, that " ' "he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees." ' " (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 254.) In order to make such a showing, the plaintiff must offer evidence that the employer was aware of plaintiff's disability or believed plaintiff to have a disability. (*Prue v. Brady Co./San Diego, Inc.* (2015) 242 Cal.App.4th 1367, 1378; *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1247 (*Avila*) [" 'An adverse

_____

to affirm. (See, e.g., *Lujano v. County of Santa Barbara* (2010) 190 Cal.App.4th 801, 806.) While it is within our power to do so, we decline to consider the Department's argument because we will affirm for the reasons stated by the trial court. Consideration of the Department's additional argument regarding the existence of Light's disability is therefore unnecessary.

employment decision cannot be made "because of" a disability, when the disability is not known to the employer.' "].)

" '[A]n employer "knows an employee has a disability when the employee tells the employer about his condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation. The employer need only know the underlying facts, not the legal significance of those facts." ' [Citation.] 'While knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts. "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations. . . ." ' " (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 592 (*Soria*).)

Here, even viewing the evidence most favorably to Light, we conclude Light has not raised a triable issue of fact that the Department was aware of her mental disability before it took the adverse employment actions described in our discussion of retaliation above. (See part II.B., *ante*.) Light first informed the Department that she suffered from PTSD and panic disorder when she sought to return to work in late September 2012, more than three months after the Department reduced her hours to zero and she took medical leave. The evidence shows prior to that time Light had merely complained about workplace stress and other ailments. Such vague complaints cannot reasonably be interpreted as notifying the Department that Light had a mental disability. (See *Soria, supra*, 5 Cal.App.5th at p. 592.) Light also points to her workers' compensation

28

paperwork, which claimed a number of symptoms (anxiety, nausea, loss of appetite, migraines, asthma attacks, body aches and pains, digestive problems, vomiting, severe abdominal cramps, and tightness in the chest). " 'Not every illness qualifies as [a] disability, however.' " (*Avila, supra*, 165 Cal.App.4th at p. 1249; see *Featherstone v. Southern Cal. Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1167.) Based on our review of the evidence, prior to Light's statement in September 2012 that she was suffering from PTSD and panic disorder, a reasonable person could conclude Light was not suffering from a mental disability. Because Light's disability "was not 'the *only* reasonable interpretation of' " Light's statements prior to September 2012, Light has not raised a triable issue of fact that the Department was aware of her disability before that time. (*Avila*, at p. 1249, italics added; see *Soria, supra*, 5 Cal.App.5th at p. 592.)[7]

We further conclude Light has not raised a triable issue of material fact regarding whether she suffered a disability related adverse employment action after late September 2012, when the Department became aware of her mental disability. Light points to various alleged deficiencies in the Department's efforts to return her to work and accommodate her stated disability. These are not adverse employment actions, and we will discuss the substance of Light's complaints in the next part.

---

7     Light also relies on a Department e-mail sent in early September, prior to her notification, seeking alternative employment for a Department employee. In context, however, the only reasonable interpretation of this e-mail is that it refers to a different employee, not Light. Light relies on this e-mail in several other arguments, including to claim that the Department spread false information about her. It does not support those arguments for the same reason: the e-mail was not about her.

Light highlights the Department's failure to promote her to Administrative Officer II at the Ocotillo Wells District in February 2013, after she had returned to work there. After initially not meeting the minimum qualifications, Light was interviewed when the position was re-advertised. A Department employee with 20 years of experience, including as an Administrative Officer I, was selected instead of Light. Even assuming this failure to promote was an adverse employment action, Light has not raised a triable issue of material fact that it was the result of disability discrimination. Light points only to the fact that a Department manager, Maria Mowrey, whom Light had named in her Human Rights Office complaint, was part of the interview panel. But Light does not tie Mowrey's presence to discrimination based on disability. Under all of the circumstances, including Mowrey's presence, we conclude a reasonable trier of fact could not find the failure to promote Light was the result of disability discrimination. (See *Scotch, supra*, 173 Cal.App.4th at p. 1009.) The trial court therefore did not err in summarily adjudicating Light's disability discrimination claim against her on the theory of intentional discrimination.

C

We turn next to Light's claim for disability discrimination based on failure to reasonably accommodate under section 12940, subdivision (m). "A reasonable accommodation is a modification or adjustment to the work environment that enables the employee to perform the essential functions of the job he or she holds or desires. [Citation.] FEHA requires employers to make reasonable accommodation for the known disability of an employee unless doing so would produce undue hardship to the

30

employer's operation. [Citation.] The elements of a reasonable accommodation cause of action are (1) the employee suffered a disability, (2) the employee could perform the essential functions of the job with reasonable accommodation, and (3) the employer failed to reasonably accommodate the employee's disability." (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 373 (*Nealy*).)

Light contends she raised a triable issue of material fact regarding whether the Department failed to reasonably accommodate her mental disability. We disagree. Within approximately two and one-half months after Light first notified the Department of her disability, the Department offered her positions at the Ocotillo Wells District and the San Diego District (with moving expenses) at the same classification she had held: Office Assistant (Permanent, Intermittent). Seals and Dolinar would no longer be Light's supervisors at Ocotillo Wells, and there is no evidence the San Diego District position would have run afoul of Light's disability. The Department reasonably accommodated Light's disability. (See *Hastings v. Department of Corrections* (2003) 110 Cal.App.4th 963, 972–973 (*Hastings*) [offering a vacant position at the same level is a reasonable accommodation]; see also *Terrell v. USAir* (11th Cir. 1998) 132 F.3d 621, 628 [evidence of delay of three months in providing accommodation did not raise triable issue of material fact].)

Light claims both positions were "illusory," but the basis for her characterization is unclear. She criticizes the terms of the Ocotillo Wells District position because it had no guaranteed hours. But those were the same terms as her prior position as a permanent, intermittent employee. She also claims there were open positions at the Department for

31

which she was qualified, but were not offered to her, and the Department limited its search to one of its divisions.  Light does not cite any evidence in support of these assertions, so we may disregard them.[8]  And, in any event, to the extent Light contends she was entitled to her choice of positions, or to a promotion, she is incorrect.  "The obligation to reassign a disabled employee who cannot otherwise be accommodated does 'not require creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement.'  [Citation.]  What is required is the '*duty* to reassign a disabled employee if an already funded, vacant position *at the same level* exists.' " (*Hastings, supra*, 110 Cal.App.4th at pp. 972–973; see *Nealy, supra*, 234 Cal.App.4th at p. 377.)

The Department was only required to offer Light a reasonable accommodation, not her choice of accommodations.  (See *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1194 (*Wilson*); *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 228 (*Hanson*).)  Positions in the same classification were a reasonable accommodation of her disability under the circumstances here, and Light has not cited any evidence that would raise a reasonable inference to the contrary.

---

[8]    To the extent Light is relying on the Department e-mail discussed in footnote 7, *ante*, it is unpersuasive for the reasons discussed.  Similarly, to the extent Light is relying on a Department e-mail from Mowrey, stating she does not have any positions for Light in a certain division, that e-mail does not give rise to the reasonable inference that the Department's entire effort to accommodate Light was limited in that fashion.

D

Light's final theory of disability discrimination is failure to engage in the interactive process under section 12940, subdivision (n). "The 'interactive process' required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively. [Citation.] Ritualized discussions are not necessarily required." (*Wilson, supra*, 169 Cal.App.4th at p. 1195.)

A claim for failure to engage in the interactive process cannot succeed if the plaintiff is offered a reasonable accommodation as part of the process. (*Wilson, supra*, 169 Cal.App.4th at p. 1195; *Hanson, supra*, 74 Cal.App.4th at p. 229 ["We see no reason why this employer should be subjected to liability for failing to engage in the interactive process where the employee was reasonably accommodated *not once but twice*. . . ."].) Because Light was offered a reasonable accommodation (and, we note, ultimately accepted that accommodation), her claim for failure to engage in the interactive process must fail. The trial court did not err in granting summary adjudication of her disability discrimination claim on this theory as well. And, because Light was unable to establish a triable issue of material fact on any of her theories of disability discrimination, the trial court did not err by summarily adjudicating this claim against her.

IV

*Intentional Infliction of Emotional Distress*

A

Light contends the trial court erred by summarily adjudicating her intentional infliction of emotional distress claim, which she asserted against Seals and Dolinar. She argues her claim is not barred by workers' compensation exclusivity and she has raised triable issues of material facts on her claims against both defendants.

For reasons we will explain, we conclude the workers' compensation system is not the exclusive remedy for Light's alleged injuries because they are based on conduct prohibited by FEHA. We further conclude Light has raised triable issues of material fact as to her claim against Seals, but not against Dolinar. We will therefore reverse the judgment on this claim as to Seals, but affirm as to Dolinar.

B

Where the provisions of the workers' compensation system apply, an employer is liable without regard to negligence for any injury sustained by its employees arising out of and in the course of their employment. (Lab. Code, § 3600, subd. (a)(1).) The employee, in turn, is generally prohibited from pursuing any tort remedies against the employer or its agents that would otherwise apply. (*Id.*, § 3602, subd. (a).) "The underlying premise behind this statutorily created system of workers' compensation is the ' "compensation bargain." ' [Citation.] Pursuant to this presumed bargain, 'the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded

34

relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort.' " (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811 (*Vacanti*).)

Even where an injury is otherwise compensable under the workers' compensation system, a cause of action seeking damages based on the injury may nevertheless be allowable where the employer's conduct falls outside the compensation bargain:  "If the alleged injury falls within the scope of the exclusive remedy provisions, then courts consider whether the alleged acts or motives that establish the elements of the cause of action fall outside the risks encompassed within the compensation bargain.  '[I]n some exceptional circumstances the employer is not free from liability at law for his intentional acts even if the resulting injuries to his employees are compensable under workers' compensation.'  [Citation.] Where the acts are 'a "normal" part of the employment relationship' [citation], or workers' compensation claims process [citation], or where the motive behind these acts does not violate a 'fundamental policy of this state' [citation], then the cause of action is barred.  If not, then it may go forward." (*Vacanti, supra*, 24 Cal.4th at pp. 811–812.)

The same framework applies regardless of whether the claimed injuries are physical or emotional.  "An employee who suffers a disabling emotional injury caused by the employment is entitled, upon appropriate proof, to workers' compensation benefits, including any necessary disability compensation or medical or hospital benefits." (*Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 754.)  "So long as the basic

conditions of compensation are otherwise satisfied (Lab. Code, § 3600), and the employer's conduct neither contravenes fundamental public policy (*Tameny v. Atlantic Richfield Co*. [(1980)] 27 Cal.3d 167 [(*Tameny*)]) nor exceeds the risks inherent in the employment relationship (*Cole* [*v. Fair Oaks Fire Protection Dist*. (1987)] 43 Cal.3d 148 [(*Cole*)]), an employee's emotional distress injuries are subsumed under the exclusive remedy provisions of workers' compensation." (*Livitsanos*, at p. 754; accord *Miklosy v. Regents of the University of Cal.* (2008) 44 Cal.4th 876, 902 (*Miklosy*).)

The latter exception, under *Cole*, has been described as follows: "[T]he exclusive remedy provisions are not applicable under various circumstances, sometimes various identified as 'conduct where the employer or insurer stepped out of their proper roles' [citations], or 'conduct of an employer having a "questionable" relationship to the employment' [citations], but which may be essentially defined as not stemming from a risk reasonably encompassed within the compensation bargain." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 16 (*Shoemaker*); see *Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 714 ["[T]here are certain types of intentional employer conduct which bring the employer beyond the boundaries of the compensation bargain, for which a civil action may be brought."].)

A number of California authorities have concluded claims for intentional infliction of emotional distress in the employment context may be asserted where the actionable conduct also forms the basis for a FEHA violation. (See, e.g., *Nazir, supra*, 178 Cal.App.4th at p. 288; *Murray v. Oceanside Unified School Dist.* (2000) 79 Cal.App.4th 1338, 1362–1363 (*Murray*); *Fretland v. County of Humboldt* (1999) 69 Cal.App.4th

36

1478, 1492; *Cabesuela v. Browning-Ferris Indus. of Cal., Inc.* (1998) 68 Cal.App.4th 101, 113 (*Cabesuela*); *Kovatch v. California Cas. Management Co.* (1998) 65 Cal.App.4th 1256, 1277–1278; *Leibert v. Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693, 1706–1707; *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 352–353 (*Accardi*); see also *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946–947 [affirming judgment on a claim of intentional infliction of emotional distress based on racial harassment in the employment context, without discussing workers' compensation exclusivity]; *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498–499 [same]. But see *Jones v. Department of Corrections and Rehabilitation* (2007) 152 Cal.App.4th 1367, 1382 [holding, as an alternative ground and without discussing the foregoing authorities, that an emotional distress claim based on allegations of discrimination was subject to workers' compensation exclusivity].)

In *Accardi*, for example, the court reasoned as follows: "Emotional distress caused by misconduct in employment relations involving, for example, promotions, demotions, criticism of work practices, negotiations as to grievances, is a normal part of the employment environment. A cause of action for such a claim is barred by the exclusive remedy provisions of the workers' compensation law. [Citation.] The Legislature, however, did not intend that an employer be allowed to raise the exclusivity rule for the purpose of deflecting a claim of discriminatory practices." (*Accardi, supra*, 17 Cal.App.4th at p. 352.) The *Accardi* plaintiff "allege[d] that she suffered emotional distress because of the pattern of continuing violations which were discriminatory; her cause of action for emotional distress is founded upon actions that are outside the normal

37

part of the employment environment and violate this state's policy against sex discrimination." (*Id.* at pp. 352–353.) *Accardi* concluded, "As such, her claim for emotional distress arising out of sexual harassment is not barred by the exclusivity provisions of workers' compensation laws." (*Id.* at p. 353.)

Seals and Dolinar argue these authorities have been undermined by the California Supreme Court's 2008 opinion in *Miklosy, supra*, 44 Cal.4th 876. In *Miklosy*, the plaintiffs alleged causes of action for retaliation in violation of the California Whistleblower Protection Act (§ 8547 et seq.), wrongful termination and constructive wrongful termination in violation of public policy, and intentional infliction of emotional distress. (*Id.* at p. 884.) As to the last claim, "Plaintiffs allege[d] defendants engaged in 'outrageous conduct' that was intended to, and did, cause plaintiffs 'severe emotional distress,' giving rise to common law causes of action for intentional infliction of emotional distress." (*Id.* at p. 902.) *Miklosy* concluded, "The alleged wrongful conduct, however, occurred at the worksite, in the normal course of the employer-employee relationship, and therefore workers' compensation is plaintiffs' exclusive remedy for any injury that may have resulted." (*Ibid.*)

*Miklosy* reaffirmed the two exceptions to workers' compensation exclusivity described above, for *Tameny* wrongful discharge claims and for conduct that " 'exceeds the risks inherent in the employment relationship' " under *Cole*, but found that neither applied. (*Miklosy, supra*, 44 Cal.4th at pp. 902–903.) As to the first exception, it recognized the obvious point that a claim for intentional infliction of emotional distress is not a *Tameny* claim. (*Ibid.*) As to the second, it explained, "[I]t might seem at first blush

38

to apply here—based on the argument that whistleblower retaliation is not a risk inherent in the employment relationship—but we rejected this same argument in *Shoemaker . . . , supra*, 52 Cal.3d at page 25. Like plaintiffs here, the plaintiff in *Shoemaker* alleged whistleblower retaliation and also a *Tameny* cause of action, and although he incorporated these allegations as part of his claim of intentional infliction of emotional distress, we held workers' compensation to be his exclusive remedy and affirmed the trial court's dismissal of that cause of action." (*Miklosy*, at p. 903.)

Our colleagues in Division Three of this court recently applied *Miklosy* in *Yau v. Santa Margarita Ford, Inc.* (2014) 229 Cal.App.4th 144 (*Yau*). *Yau* involved an appeal from an order sustaining a demurrer to causes of action for wrongful discharge in violation of public policy and intentional infliction of emotional distress. (*Id.* at p. 147.) As to the wrongful discharge cause of action, *Yau* held that the plaintiff had adequately alleged wrongful discharge in violation of public policies prohibiting fraud and theft. (*Id.* at p. 156.) It did not consider whether the plaintiff had also alleged wrongful discharge in violation of FEHA. (*Id.* at p. 160.) As to the emotional distress claim, *Yau* relied on the general rule regarding workers' compensation exclusivity: "Physical and emotional injuries sustained in the course of employment are preempted by the workers' compensation scheme and generally will not support an independent cause of action. [Citation.] Emotional injuries caused by workplace discipline, including termination, fall within this rule." (*Id.* at p. 161.)

Although it did not expressly mention FEHA discrimination or retaliation, *Yau* acknowledged the authorities "that have found exceptions to this general rule of

39

preemption when the intentional infliction of emotional distress claim is based on conduct that violates a fundamental public policy." (*Yau, supra*, 229 Cal.App.4th at p. 161.) But *Yau* found those authorities unpersuasive in light of *Miklosy*. *Yau* interpreted *Miklosy* to allow only a single exception to the workers' compensation exclusivity rule, for *Tameny* claims. (*Id.* at p. 161.) *Yau* concluded, "This exception does not, however, allow a 'distinct cause of action, not dependent upon the violation of an express statute or violation of a fundamental public policy.' " (*Ibid.*, quoting *Miklosy, supra* 44 Cal.4th at p. 902.)

We believe *Yau* reads *Miklosy* too narrowly. *Miklosy* expressly retained the second exception to workers' compensation exclusivity, for conduct that " 'exceeds the risks inherent in the employment relationship,' " and acknowledged its appeal in the whistleblower context. (*Miklosy, supra*, 44 Cal.4th at p. 903.) While our Supreme Court ultimately concluded the exception did not apply to whistleblower retaliation, neither *Miklosy* nor the authorities on which it relies considered the much larger body of case law supporting the proposition that conduct in violation of FEHA is not part of the employment relationship or the compensation bargain at the heart of the workers' compensation system. (See *Nazir, supra*, 178 Cal.App.4th at p. 288 ["Neither discrimination nor harassment is a normal incident of employment."]; *Murray, supra*, 79 Cal.App.4th at p. 1363 ["This is so because the [emotional distress] claim is 'founded upon actions that are outside the normal part of the employment environment. . . .' "]; *Cabesuela, supra*, 68 Cal.App.4th at p. 113 ["Thus, where, as here, a plaintiff's emotional distress claim is premised upon his employer's violation of a fundamental public policy of

40

this state, such misconduct lies outside of the exclusive remedy provisions of the Lab. Code."]; *Accardi, supra*, 17 Cal.App.4th at p. 352–353.)  Indeed, although it focused on discharge, the reasoning of our Supreme Court in *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1100 is instructive:  "When an employer's decision to discharge an employee results from an animus that violates the fundamental policy of this state proscribing any interference in the official investigation of sexual harassment (. . . § 12975), such misconduct cannot under any reasonable viewpoint be considered a 'normal part of the employment relationship' (*Cole . . .* , *supra*, 43 Cal.3d at p. 160) or a 'risk reasonably encompassed within the compensation bargain.'  (*Shoemaker . . .* , *supra*, 52 Cal.3d at p. 16.)"  The same reasoning applies here, to conduct that interfered with the official investigation of Hurley's complaint of sexual harassment; discrimination based on sex, sexual orientation, and marital status; and retaliation.[9]

In sum, absent further guidance from our Supreme Court, we are unwilling to abandon the longstanding view that unlawful discrimination and retaliation in violation of FEHA falls outside the compensation bargain and therefore claims of intentional infliction of emotional distress based on such discrimination and retaliation are not

---

[9]    In addition, because *Yau* did not squarely consider a claim for intentional infliction of emotional distress based on FEHA retaliation or discrimination, it is of less persuasive value.  (*Yau, supra*, 229 Cal.App.4th at p. 160 & fn. 1.)  The other authorities cited by Dolinar and Seals are similarly unpersuasive because they do not consider emotional distress claims based on violations of FEHA at all.  (See *Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013) 222 Cal.App.4th 819, 832 [failure to reimburse plaintiff for mileage]; *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 367 [mistreatment by supervisor]; *Mueller v. County of Los Angeles* (2009) 176 Cal.App.4th 809, 823–824 [whistleblower retaliation].)

subject to workers' compensation exclusivity.  While the Supreme Court in *Miklosy* held that allegations of *whistleblower* retaliation were insufficient to state an exception to workers' compensation exclusivity, it did not remove the jurisprudential basis on which numerous authorities have held that allegations of *FEHA* discrimination and retaliation did state such an exception.  We therefore adhere to those authorities here.[10]

C

Given the foregoing discussion, Light may pursue a claim for intentional infliction of emotional distress in the employment context where the conduct at issue violates FEHA and also satisfies the elements of the claim.  "The elements of the tort of intentional infliction of emotional distress are:  ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the

---

[10]    We also find unpersuasive Seals and Dolinar's claim that "public policy" prohibits Light's claim under the circumstances here.  Citing *Jones v. The Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, they point out that individual supervisors are not liable for FEHA retaliation.  They argue that allowing an intentional infliction of emotional distress claim would undermine that principle.  In *Reno v. Baird* (1998) 18 Cal.4th 640, for example, our Supreme Court concluded a supervisor may not be personally liable for wrongful discharge based on the same conduct that violates FEHA: "It would be absurd to forbid a plaintiff to sue a supervisor under the FEHA, then allow essentially the same action under a different rubric." (*Id.* at p. 664.)  We disagree that this principle applies here.  A claim for intentional infliction of emotional distress is not merely "a different rubric."  It is a substantively different claim, aimed at a different wrong, and protects a different personal interest.  Seals relies on *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55 (*Janken*), but that opinion found that the plaintiff had not alleged "outrageous conduct beyond the bounds of human decency." (*Id.* at p. 80.)  *Janken* did not consider whether a claim for intentional infliction of emotional distress against a supervisor would be proper if such an allegation had been included.

42

defendant's outrageous conduct. . . ." Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' " (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903 (*Christensen*).) "Liability for intentional infliction of emotional distress ' "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051.) A retaliatory motive alone is insufficient to sustain a claim for intentional infliction of emotional distress. (*Janken, supra*, 46 Cal.App.4th at p. 80.)

" 'The law limits claims of intentional infliction of emotional distress to egregious conduct *toward plaintiff* proximately caused by defendant.' [Citation.] The only exception to this rule is that recognized when the defendant is aware of, but acts with reckless disregard of the plaintiff and the probability that his or her conduct will cause severe emotional distress to that plaintiff." (*Christensen, supra*, 54 Cal.3d at p. 905.)

As to Seals, a reasonable trier of fact could find she ostracized Light in the workplace, encouraged Light to lie to investigators, pursued Light at home and in the office to determine whether Light did so, and verbally and physically attacked Light after Light disobeyed. The trier of fact could conclude this conduct was extreme and outrageous (especially in light of Seals's supervisory position), taken for purposes of retaliation prohibited by FEHA, and intended to cause Light emotional distress. Triable issues of fact therefore preclude summary adjudication of this claim as to Seals. (See *Aguilar, supra*, 25 Cal.4th at p. 850.)

As to Dolinar, however, we conclude summary adjudication was proper. Even viewed most favorably to Light, the evidence shows Dolinar's conduct was not extreme,

43

outrageous, or beyond the bounds of what we tolerate as a civilized community. (See *Hecimovich v. Encinal School Parent Teacher Org.* (2012) 203 Cal.App.4th 450, 476.) Light points to evidence that Dolinar refused to listen to Light's complaints about retaliation, organized the anti-Hurley counseling session after the gun scope incident, encouraged Seals's efforts to silence Light, awarded Seals a commendation after the February 23 incident, and participated in the Department's retaliation against Light (including denying promised training and shifting Light's work location). Even crediting this evidence, we conclude Dolinar's actions were not extreme or outrageous as a matter of law. While a reasonable trier of fact could conclude Dolinar acted improperly, and likely contributed to the Department's violation of FEHA's anti-retaliation provision, her actions are common—though ultimately misguided—supervisory actions. (See *Janken, supra*, 46 Cal.App.4th at p. 80.) Dolinar also cannot be responsible for the actions of her subordinates, such as Seals, merely because she was their supervisor. A claim for intentional infliction of emotional distress requires extreme or outrageous conduct by the defendant herself; her "responsibility" as a supervisor alone is insufficient.

V

*Assault*

Light contends the trial court erred by summarily adjudicating her assault claim against Seals based on Light's inability to show an essential element of that claim, namely that she was subjected to a threat from harmful or offensive touching. " 'Generally speaking, an assault is a demonstration of an unlawful intent by one person to inflict immediate injury on the person of another then present'. [Citation.] A civil action for

44

assault is based upon an invasion of the right of a person to live without being put in fear of personal harm." (*Lowry v. Standard Oil Co. of Cal.* (1944) 63 Cal.App.2d 1, 6–7; see *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1603–1604 (*Plotnik*).)

"Penal Code section 240 defines the crime of assault as 'an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' 'In tort actions for assault . . . , the courts usually assume that th[is] Penal Code definition[] and related criminal cases are applicable. [Citations.]' [Citation.] The Supreme Court has held proof of a criminal assault 'requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another.' " (*Plotnik, supra*, 208 Cal.App.4th at p. 1604.) "Physical injury is not a required element of either assault or battery. The tort of assault is complete when the anticipation of harm occurs." (*Kisesky v. Carpenters' Trust for Southern Cal.* (1983) 144 Cal.App.3d 222, 232.)

For example, in *People v. Puckett* (1975) 44 Cal.App.3d 607 (*Puckett*), the court considered a challenge to the evidence supporting a criminal conviction for assault. The evidence showed the defendant followed the victim home, "ran after her and tried to prevent the [victim] from closing the door. After a few seconds, during which time the [victim's] mother had joined her, defendant ceased his effort and the door closed." (*Id.* at p. 610.) The reviewing court concluded this evidence was sufficient to constitute an assault: "In the case at bench there is a showing of an attempt to commit a battery. Even though pushing a door cannot be deemed a harmful injury, the pushing of a door which

45

was touching the [victim] could be deemed an offensive touching and a battery is defined as a harmful or offensive touching." (*Id.* at pp. 614–615.)

A reasonable trier of fact could find, just as in *Puckett*, that Seals intended to press the door against Light, or strike her with it, after Seals followed Light to her office during the February 23 incident. Seals's act of pressing on the door placed Light in immediate apprehension of a harmful or offensive touching, which is assault. Seals's claim that she did not intend to commit battery is a disputed factual question on the current record. Because a reasonable trier of fact could infer that Seals did intend to commit battery, based at least on her "rage" during the February 23 incident and on the fact that the door did actually hit Light, summary adjudication is unwarranted. (See *Aguilar, supra*, 25 Cal.4th at p. 850.)

## DISPOSITION

The judgment as to the Department is reversed in part as to Light's claims for retaliation and failure to prevent retaliation and discrimination and affirmed in part as to Light's claim for disability discrimination. As between the Department and Light, Light shall recover costs on appeal.

The judgment as to Seals is reversed in part as to Light's claims for intentional infliction of emotional distress and assault and affirmed in part as to Light's claim for false imprisonment (which Light did not challenge in this appeal). As between Seals and Light, Light shall recover costs on appeal.

The judgment as to Dolinar is affirmed. As between Dolinar and Light, Dolinar shall recover costs on appeal.

McCONNELL, P. J.

WE CONCUR:

HALLER, J.

AARON, J.