Filed 12/8/23  Millan v. City of Yorba Linda CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANTONIO MILLAN, | |
| Plaintiff and Appellant, | G061058 |
| v. | (Super. Ct. No. 30-2017-00964412) |
| CITY OF YORBA LINDA, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Richard Y. Lee, Judge.  Affirmed.

Arthur Kim Law Firm and Arthur Kim for Plaintiff and Appellant.

Lozano Smith, Mark K. Kitabayashi and Fabiola M. Rivera for Defendant and Respondent.

Plaintiff Antonio Millan appeals from the judgment entered after a jury found his employer, City of Yorba Linda (the City), did not retaliate against him in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) or section 1102.5 of the Labor Code.  Millan argues the trial court committed evidentiary error in various respects and engaged in judicial misconduct.

We affirm.  For the reasons we explain, Millan has failed to establish any prejudicial evidentiary error or judicial misconduct during trial.

FACTS

I.

OVERVIEW OF THE CITY'S PUBLIC WORKS DEPARTMENT

Armando Jaime has been the superintendent of the City's Public Works Department (Public Works or department) since 2004.  Jaime manages a team of 8 to 10 maintenance workers who are employed by the City and also oversees the work of 60 to 100 contract workers retained through outside contractors.  Derrick Warren is a department supervisor who reports to Jaime.  Since about 2011, Roldan Serrano has served as the department's lead worker; Serrano reports to Jaime and Warren.  The department operates out of a corporation yard known as the "City Yard" which it shares with the City's Public Parks Department (Parks or Parks department), although the two departments do not work together or otherwise coordinate efforts.  Supervisory personnel for both departments have offices in a trailer located at the City Yard.

Public Works maintenance workers have a general routine by which they carry out their set duties and responsibilities.  Every morning, maintenance workers drive through the City's "major arterials" to make sure the public rights of way remain free of hazards.  They pick up trash, branches, and anything that might have been thrown into the street.  They temporarily fill potholes, make sure regulatory signs are up, and confirm traffic signals are functioning.

After the maintenance workers conduct such "arterial policing," they move through their assigned grid area where they clean weeds, pick up trash, perform light trimming, check "catch basins"[1] to make sure no vegetation is growing out of them, and make sure signs are visible without obstruction. The department assigns one maintenance worker to maintain each of the six grid areas in the City; the assigned worker generally works independently at the worker's assigned grid area with minimal supervision "[a]ll day long." However, when cleaning catch basins, maintenance workers operate in "two-man crew[s]."

There are times when maintenance workers work with others in a group, such as in the event of a fire, significant rain and floods, or the declaration of a natural disaster. On such occasions, the staff comes together to address problems, such as mud flows, and to remove dead plant material, sandbag vulnerable areas, and assist the Sheriff's Department with traffic control.

Maintenance workers are responsible for laying sandbags in the City. After working six months to one year in their assigned grid area, maintenance workers are expected to know the locations within their respective grid areas that require erosion control. The maintenance worker decides how many sandbags will be needed in the worker's assigned area, when to make and deliver sandbags to that area (whether on a daily or weekly basis), and where to place them.[2]

---

[1] A catch basin is the portion of a storm drain where water enters.

[2] Areas 1 through 4 typically require more sandbags because they do not have storm drain inlets or curbing gutters which funnel water to localized areas for the capture of the rainstorm. "When you get up to the further end of town, which is area 5 and 6, it is completely developed, master plan as you may call it. And then along with that, about 90, 95 percent of the erosion control out there is implemented by [the City's] landscape contractors as part of their . . . maintenance packages through [the City's] landscape department." Although they may require fewer sandbags, areas 5 and 6 have more catch basins than other areas.

## II.

### THE CITY HIRES MILLAN AS A MAINTENANCE WORKER

In 2006, the City hired Millan to work in Public Works as a Maintenance Worker I. He was initially assigned to work in area 4, where he worked for the first eight years of his 11-year tenure in that department.

## III.

### MILLAN'S PERFORMANCE HISTORY FROM 2006–2013

Millan's job performance was evaluated every year in November by Jaime, in conjunction with Warren and Serrano. In his November performance evaluations given in 2006, 2007, 2008, 2010, 2011, and 2012, Millan received an overall rating of "competent." In his 2009 and 2013 performance evaluations, he received an "above average" rating.

Plan progress notes accompanying the performance evaluations pointed out areas in which Millan needed to improve. In 2007, he was informed he needed to focus on out-of-sight maintenance areas that he had not been maintaining. In 2008 and 2009, he was told to work on addressing traffic control reporting and sign maintenance.

In 2010, the performance evaluation's supplemental comments stated, "[Y]ou need to control your emotions and anger when spoken, counseled, and are reprimanded." Jaime testified regarding the context of those comments: "When items of deficiencies were brought to [Millan's] attention or he had a little misstep [in] damag[ing] some vehicles or maybe he wasn't getting along with his co-workers, something of that nature, and Mr. Warren or myself or his immediate supervisor would have to discuss [it] with him, he became a little bit aggressive, a little bit hostile; his demeanor changed." The plan progress comments stated: "'This up-and-coming year work on the team building concept. Controlling your emotion, anger when spoken to.'"

Millan testified he did not believe the 2010 performance evaluation comments regarding controlling his emotions and anger were appropriate. Millan

testified Jaime was the one who engaged in inappropriate conduct. Millan testified that on one occasion, Jaime called him into his office and said: "How about you help your co-worker get the day off he requests and just get under the desk and give me a blow job." Millan's statement was corroborated by another maintenance worker, Roy De Herrera, who testified he witnessed that incident. De Herrera added "there were several of us [Jaime] would say that to. If you would go in and ask for vacation; if you would ask for P.P.E., he would say, oh well, get under the desk. And to him it was a joke, but to us it wasn't. And you couldn't really say anything in fear of retaliation, you know, your job, and him having you do things." Jaime testified he "never said anything of that nature to anybody."

In 2011, Millan was credited for having improved his cooperation and attitude toward supervisors and for controlling his anger and emotions. He was also asked to be conscientious regarding sick leave use and to continue building the team concept. Millan was promoted to Maintenance Worker II.

In April 2012, Millan received a written reprimand for insubordinate behavior. Jaime explained in his testimony Millan had been taking unauthorized breaks and continued to do so even after Jaime had spoken to him about it. When Jaime brought him into the office to discuss the matter, Millan "became exceptionally angry and hostile," claimed Jaime was harassing him regarding his unauthorized breaks, and stated he should be able to take a break whenever he felt he needed one. Millan told Jaime "'I am done talking to you,'" got up, and started walking out of Jaime's office. Jaime told Millan he was being insubordinate and needed to come back and sit down so they could continue to discuss the problem. By November 2012, when Millan received his annual performance evaluation, it was noted he had again made improvements in controlling his anger.

Millan's 2013 performance evaluation with an overall rating of "above average" appeared to be the best evaluation he received while he worked in Public

Works.  In the plan progress comments, he was asked to continue to improve any high maintenance standards and to be conscientious about arriving late to work and with sick leave as he was "having a little issue with both of those at that point."

IV.

2014:  MILLAN UNSUCCESSFULLY SEEKS A JOB TRANSFER, IS REASSIGNED, FILES AN INTERNAL COMPLAINT, AND RECEIVES A NEGATIVE PERFORMANCE EVALUATION

In 2014, Millan unsuccessfully tried to transfer to the Parks department. On July 28, 2014, Millan's grid area assignment changed from area 4 to area 6.  Jaime testified Millan was reassigned because the department hired a new employee who Millan trained in area 4.  He further testified it is the department's practice to assign a new employee to the area in which the employee had been trained and to reassign the more senior employee to a different area.

In contrast to Jaime's testimony, Millan testified he had not trained anyone at the time he was reassigned, no one had been hired to take his position in area 4, and the department's practice was to keep workers with seniority assigned to the same grid area. On September 29, 2014, he submitted a written complaint to City Hall, accusing Jaime and Warren of bullying and retaliation.

In November 2014, although Millan received an overall competent rating in his performance evaluation, it was the first time he received specific negative ratings; those negative ratings were in the areas of cooperation and attitude toward supervision and effectiveness under stress.

His evaluation noted that during the 2013–2014 rating period, Millan had received seven "notices" regarding the following:  (1) lack of maintenance in his area (two notices); (2) lack of care regarding City property (Millan had lost the City's fuel card); (3) "a lot of errors" on one timesheet, requiring Warren to continue calling Millan back to correct them, followed by a second timesheet that was inaccurate; (4) taking unauthorized breaks; and (5) outbursts and anger management.  Although there is a place

6

to respond to comments in performance evaluations, Millan did not dispute the seven incidents or otherwise comment on them.

## V.

### MILLAN FILES AN ADMINISTRATIVE COMPLAINT

On November 3, 2015, Millan filed a complaint with what was then called the Department of Fair Employment and Housing (DFEH).[3] In the DFEH complaint, he made accusations against Jaime and Warren; Jaime was a named respondent in the complaint.[4] The City received notice of the complaint on November 9, 2015. The City investigated the allegations of the DFEH complaint but did not find them to be true and imposed no discipline.

Jaime testified he believed Millan had filed his DFEH complaint after Jaime finished writing Millan's 2015 performance evaluation. Millan's overall performance rating at this time was "needs improvement." He received unsatisfactory ratings in the area of cooperation with fellow employees and supervision.

## VI.

### MILLAN'S TESTIMONY REGARDING HOW HIS WORK SITUATION CHANGED AFTER HE FILED THE DFEH COMPLAINT

Millan testified, after he filed the DFEH complaint, he started receiving negative reviews and unsafe work assignments and continued to receive unsafe assignments until he left Public Works one and one-half years later. He stated he was

---

[3] The DFEH has since changed its name to the Civil Rights Department. Because at all relevant times the department was referred to as the DFEH, we refer to it as the DFEH for clarity.

[4] Although not included in the evidence presented to the jury, the DFEH complaint alleged, inter alia, Millan was subjected to (1) discrimination and harassment based on his race and national origin (Latino who was born in the United States as opposed to born in Mexico), (2) gender and perceived sexual orientation discrimination, and (3) retaliation, all in violation of FEHA.

7

"bullied" by Jaime and Warren, and the whole department was "just laughing at [him]." He also testified his workload doubled.

Jaime denied Millan's claims, including that his work doubled. Jaime testified Millan continued to be assigned to grid area 6 and his workload did not increase.

Millan testified that within two weeks of the DFEH complaint, Jaime came out to his job site and instructed him to create two rows of sandbags, three sandbags high, for erosion control, which Millan thought was more than needed. Jaime denied directing Millan about sandbag placement in his grid area. Millan also testified he believed he received new assignments after he filed the DFEH complaint.

Millan testified, on one occasion in January 2016, he and his coworkers were "made [to] work in the rain picking up tumbleweeds" on a hillside following a resident's complaint about the tumbleweeds. Millan slipped and fell, hurting his right buttocks area. Millan testified that after he told Jaime he was in pain and wanted to go to the doctor, Jaime instructed him to continue working. Millan further testified he saw Jaime stand on top of the hillside with his arms crossed looking at Millan and grinning while Millan worked.

In contrast, Jaime testified Millan had refused Jaime's offer to stop working that day and see a doctor; instead, Millan insisted on continuing to work. Jaime further testified, the following morning, Millan told Jaime he wanted to seek medical attention. "At that point," Jaime filled out the paperwork Millan needed to go to a medical clinic. After Millan went to the clinic, he came back with a doctor's note which imposed some work restrictions and was thereafter placed on temporary light duty.

Millan testified, in 2016, he was not only responsible for providing sandbags in his assigned grid area but was required to help maintenance workers with their sandbags in their assigned areas; he contended the extra-area assigned work was atypical. He testified in 2017 he continued to perform significant sandbag work, sometimes in the rain which made the sandbags heavier and the work "torture."

8

Millan also testified he worked alone in the wilderness on three occasions (the first time in March 2016). He testified he was only provided with the assistance of one contract worker to help clean out storm drains when usually there would be a crew of four people to do storm drain work. He also testified he was required to dig actual inlets and trenches with a shovel and such assignments were made by his supervisors to torture him.

Jaime testified after Millan filed the DFEH complaint, Jaime did not treat Millan any differently than how he treated any other maintenance worker under his supervision. He further testified any disciplinary actions issued to Millan after he filed the DFEH complaint were not given because of the complaint.

VII.

THE PERFORMANCE IMPROVEMENT PLANS

In January 2016, Millan received a written reprimand from Public Works director Michael Wolfe for writing an inappropriate comment on an official City form because Millan had done the same thing before and had been previously counseled numerous times for such conduct.

In February 2016, Serrano provided Millan with a list of 24 tasks (punch list) that had been neglected by Millan and directed him to complete all the tasks within two weeks. Millan returned the punch list to Serrano, claiming he had completed all the tasks. Serrano went to grid area 6 and found, contrary to Millan's representation, Millan had not completed all of the tasks listed on the punch list. Millan was placed on a six-month performance improvement plan based on his unsatisfactory performance.

At the conclusion of Millan's first performance improvement plan term, the City determined Millan had failed to adhere to his supervisors' directives and administrative policies regarding sick leave and filling out time sheets. It was recommended Millan be given a three-day disciplinary suspension. Millan appealed the discipline to the assistant city manager who upheld the decision.

9

The City then placed Millan on a second performance improvement plan. Millan again failed to meet the performance measures, warranting further discipline. During the second performance improvement plan term, Millan was involved in two incidents.

First, one morning in October 2016, although on call at the time, Millan failed to respond within one hour of the 4:00 a.m. call he received from the Orange County Sheriff's Department dispatch regarding a city sign that had been struck by a car and fell. The accident also resulted in mud and other debris on the sidewalk and street which, along with the downed sign, needed to be removed to prevent further accidents from happening.

Instead of responding to the call and reporting to the scene, Millan reported to the City Yard. He claimed he was justified in reporting to the City Yard instead of to the call scene because the response time was too close to his 6:00 a.m. report time, and he arrived at work at 5:45 a.m. Jaime testified even if Millan had arrived to work at 5:45 a.m., he "should have immediately activated and responded to the call." Jaime explained: "Obviously he could have alerted his immediate supervisor that he was already moving to the field to respond to the call and it would have been so duly noted." Millan later admitted he had arrived at the City Yard by 5:35 a.m. The City determined he had time to respond to the call but failed to do so and lied about it. In addition, Millan thereafter submitted paperwork seeking to be paid the two hours of overtime he might have earned had he responded to the call.

Second, on December 12, 2016, Millan was again on call when the sheriff's department was contacted by a homeowner regarding a broken water line behind the homeowner's house. Millan responded to the call and claimed he looked for the shut off valve for three hours. He did not find the shut off valve and did not contact his supervisor or the City for assistance. Instead, at 11:00 p.m., he went home, leaving the water running down the slope all night. Not only did the City pay for the leaking water,

10

but the water also caused erosion on the slope and created mud flow into the storm drain which the City needed to repair.

The City decided to impose discipline on Millan for his failure to appropriately respond to what was considered two serious response calls. It proposed demoting Millan to the Maintenance Worker I position. Notice was given to Millan of the intent to demote him. Following a hearing before the city manager, the demotion recommendation was upheld.

## VIII.

### DURING HIS SECOND PERFORMANCE IMPROVEMENT PLAN, MILLAN ANONYMOUSLY FILES A CAL/OSHA COMPLAINT

In October 2016, Millan anonymously filed a complaint with the Division of Occupational Safety and Health (Cal/OSHA), complaining "City employees were entering storm drains without proper protective equipment, without checking air quality, and without having a confined space program in place." The City received notice of the complaint around October 10, 2016. Jamie did not know who filed the complaint, although the assistant to the city manager speculated Millan might have made the complaint.

## IX.

### MILLAN TRANSFERS TO PARK

In August 2017, Millan transferred to the City's Parks department where he continued to work as of the date of trial. As an employee of the Parks department, Millan has been supervised by Brad Skeene. Skeene did not supervise or oversee Millan while Millan worked in Public Works.

## X.

### MILLAN'S CONTENTIONS OF CONTINUED RETALIATION

Millan testified he continued to suffer retaliation by Jaime after transferring to Parks. As an example, he claimed on one occasion, while he was driving home on the

11

freeway, he saw Jaime pull up next to him and stare at him through his sunglasses, causing Millan to feel afraid. Another City employee, Antonio Munoz, testified he "observed" the incident which he described as lasting for only a "few seconds" during which he could not say whether Jaime was driving at an unsafe speed, although he was driving faster than traffic. Jaime denied chasing Millan down in his car and stated he did not interact with Millan since he transferred to the Parks department. Millan filed a complaint about the incident with the City. The investigator concluded there was insufficient evidence to sustain Millan's claim. Millan also testified Jaime would stare at him and spit in his direction.

PROCEDURAL HISTORY

I.

MILLAN FILES A LAWSUIT AGAINST THE CITY

In December 2017, Millan initiated the instant lawsuit. In his first amended complaint, Millan alleged the City was liable for retaliation in violation of FEHA, failure to prevent retaliation in violation of FEHA, retaliation in violation of Labor Code section 1102.5, wrongful demotion in violation of public policy, intentional and negligent emotional distress, and penalties under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.).

Millan's claims for wrongful demotion and penalties under Labor Code section 2698 were dismissed before trial; neither claim is at issue in this appeal. In the respondent's brief, the City states that during the jury trial, Millan "voluntarily withdrew his causes of action for intentional and negligent infliction of emotional distress." Millan does not challenge this assertion and does not make any argument in his appellate briefs regarding his intentional and negligent infliction of emotional distress claims.

12

## II.

### THE JURY RETURNS SPECIAL VERDICTS IN FAVOR OF THE CITY AND JUDGMENT IS ENTERED ACCORDINGLY

Following trial, the jury returned special verdicts in favor of the City on both the retaliation in violation of FEHA claim and the retaliation in violation of Labor Code section 1102.5 claim. As to the retaliation in violation of FEHA claim, the jury found: (1) Millan filed a complaint with the DFEH and (2) the City subjected Millan to an adverse employment action, but (3) Millan's complaint to the DFEH was not a substantial motivating reason for the City's conduct.

As to Millan's claim for retaliation in violation of Labor Code section 1102.5, the jury found: (1) the City was Millan's employer, (2) Millan "disclose[d] to a government agency, California Occupational Safety and Health Administration, conduct by the City," (3) Millan had reasonable cause to believe the information disclosed a violation of a state statute, and (4) the City subjected Millan to an adverse employment action, but (5) Millan's disclosure of information to the California Occupational Safety and Health Administration was not a contributing factor in the City's decision to subject Millan to an adverse employment action.

Judgment was entered in favor of the City and against Millan.

## III.

### THE MOTION TO VACATE THE JUDGMENT AND GRANT A NEW TRIAL

Millan filed a motion to vacate judgment and grant a new trial (motion for a new trial). In his second amended notice of motion, Millan stated he brought the motion on the following grounds: "'1. Irregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial. . . . [and] 7. Error in law, occurring at the trial and excepted to by the party making the application.' Code of Civil Procedure Section 657."

13

The second amended notice of motion further stated: "Specifically, the motion is made on the grounds that a miscarriage of justice resulted and Plaintiff was deprived of a fair trial because: (i) the Court excluded key eyewitness testimony of retaliation; (ii) the Court excluded key impeachment and rehabilitation testimony; (iii) the Court excluded me too evidence of retaliatory intent; (iv) the Court excluded evidence of the underlying complaint that motivated the alleged retaliation; (v) [the trial judge] prejudiced the jury against Plaintiff by screaming at his representatives in front of the jury and through other acts of bias; and (vi) the Court excluded evidence of Defendant's negligent acts preceding the alleged retaliation, which supported Plaintiff's failure to prevent retaliation claim."

After Millan filed a notice of appeal from the judgment, the trial court denied the motion for a new trial, explaining its reasoning as to each of the grounds in a detailed 30-page ruling.

## DISCUSSION

### I.

#### APPELLATE REVIEW GENERALLY

We apply three fundamental principles of appellate review: "(1) a judgment is presumed correct; (2) all intendments and presumptions are drawn in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

An order denying a motion for a new trial is not directly appealable but is reviewable on appeal from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.) In reviewing an order denying a motion for a new trial, we "'must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether

14

the error was prejudicial.'" (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 46–47.)  This differs from our review of an order granting a motion for a new trial, which we review for abuse of discretion.  (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412; *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 187, 194.)

II.

CONTENTIONS OF EVIDENTIARY ERROR

In his opening brief, Millan argues the trial court committed prejudicial evidentiary error by excluding evidence of Jaime's and Warren's retaliatory intent, relevant to establishing liability under FEHA and Labor Code section 1102.5.  For the reasons we explain, Millan's contentions of prejudicial evidentiary error are forfeited and even if they are not forfeited they are without merit.

A.

*Millan's Claims of Prejudicial Evidentiary Error Are Forfeited Because His Appellate Briefs Violate Rule 8.204 of the California Rules of Court*

In this appeal, Millan argues several of the trial court's evidentiary rulings constituted prejudicial error.  However, Millan fails to provide in his opening brief a summary of the significant facts (e.g., the trial evidence), as required by rule 8.204(a)(2)(C) of the California Rules of Court, necessary to provide context to consider his contentions of prejudicial error.

In his opening brief, under the heading "Summary of Facts and Procedural History" (capitalization, boldface, and underline omitted), Millan states he filed a DFEH complaint against Jaime and Warren and then filed a Cal/OSHA complaint alleging safety violations by Public Works.  The "summary" of trial evidence concludes by stating:  "As a result of his complaints, Millan alleged that he suffered retaliation from the City, in particular from Superintendent Jaime.  The retaliation included:  (i) a doubling of Millan's workload; (ii) physically punishing and unsafe work assignments; and (iii) unfair scrutiny and discipline including constant writeups, verbal reprimands,

15

yelling, long sessions in Jaime's office, performance improvement plans, suspension and demotion."

In support of this summary of retaliatory conduct, the opening brief cites to approximately 200 pages of trial testimony. Rule 8.204(a)(1)(C) of the California Rules of Court provides each appellate brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears. If any part of the record is submitted in an electronic format, citations to that part must identify, with the same specificity required for the printed record, the place in the record where the matter appears." Millan's block citations do not comply with rule 8.204(a)(1)(C), "and frustrate the court's ability to evaluate [Millan's] position." (*Bullock v. City of Antioch* (2022) 78 Cal.App.5th 407, 422; *In re Marriage of Fink* (1979) 25 Cal.3d 877, 888 ["It is neither practical nor appropriate for [the appellate court] to comb the record on [appellant's] behalf"].) Accordingly, "[w]hen an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited." (*In re S.C.* (2006) 138 Cal.App.4th 396, 406–407.)

In light of his failure to provide a meaningful summary of facts with specific and accurate citations to the record, Millan has forfeited his contentions of prejudicial evidentiary error.

B.

*Millan's Forfeited Contentions of Prejudicial Evidentiary Error Are Without Merit*

In his opening brief, Millan argues the trial court committed evidentiary error by: (1) excluding the testimony of Bradley Skeene; (2) excluding testimony by or about "me-too victims" De Herrera, Robert Trevino, Cesar Villalpando, and Jessy Rangel; (3) "preventing impeachment, rehabilitation, and refreshment of witnesses"; (4) excluding evidence of substantive allegations of the DFEH complaint; and (5)

16

excluding evidence of "negligent acts and omissions leading up to retaliation." (Capitalization and boldface omitted.)

He contends the exclusion of such evidence prejudicially impaired his ability to prove retaliatory intent on the part of Jaime and Warren in support of his retaliation claims. Even if Millan's contentions of evidentiary error have not been forfeited, for the reasons we explain, they are without merit.

1.

Governing Legal Standards for Retaliation Claims Brought Under FEHA
and Labor Code Section 1102.5

a. Retaliation in violation of FEHA

"'[I]n order to establish a prima facie case of retaliation under FEHA, a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' [Citation.] The requisite 'causal link' may be shown by the temporal relationship between the protected activity and the adverse employment action." (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 91.)

"'In order to meet the FEHA standard, an employer's adverse treatment must "materially affect the terms, conditions, or privileges of employment." [Citation.] "[T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." [Citation.] Such a determination "is not, by its nature, susceptible to a mathematically precise test." [Citation.] "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that

17

is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h)." [Citation.] FEHA not only protects against "ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement . . . .'" [Citations.]

"'"A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient." [Citation.] "'[W]orkplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.'"" [Citation.] For example, '"[a] mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action under [the] FEHA.'" [Citation.] Similarly, '[m]ere ostracism in the workplace is insufficient to establish an adverse employment decision. [Citations.] However, "'[W]orkplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for . . . retaliation cases.'"'" (*Light v. Department of Parks & Recreation, supra*, 14 Cal.App.5th at pp. 91–92, fn. omitted.)

b. Retaliation in violation of Labor Code section 1102.5

Labor Code section 1102.5[5] "reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing

---

[5] Section 1102.5, subdivision (b) provides: "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying

18

retaliation." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77.) It "prohibits employers from retaliating against employees for 'disclosing information' concerning suspected violations of the law either internally or to government or law enforcement agencies." (*People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 720–721 [employee who complained to her employer about unpaid wages was promptly fired and threatened with deportation].)

The Labor Code first "places the burden on the plaintiff to establish, by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action. . . . Once the plaintiff has made the required showing, the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity." (*Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 718, citing Labor Code section 1102.6.) A contributing factor is """"any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision.""""" (*Lawson*, at p. 714.)

2.

Standard of Review

"The trial court enjoys 'broad authority' over the admission and exclusion of evidence. [Citation.] We review a trial court's ruling on a motion in limine to exclude evidence for an abuse of discretion. [Citations.] The trial court's authority is particularly broad 'with respect to rulings that turn on the relevance of the proffered evidence.'" (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295–296 (*McCoy*); *Coral*

---

before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

19

*Farms, L.P. v. Mahony* (2021) 63 Cal.App.5th 719, 733 ["Claims of evidentiary error are reviewed for an abuse of discretion"].)

"A judgment cannot be reversed 'unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice.' [Citation.] An evidentiary '"error is not reversible unless '"it is reasonably probable a result more favorable to the appellant would have been reached absent the error."'"'" (*Coral Farms, L.P. v. Mahony, supra*, 63 Cal.App.5th at p. 733.)

3.

Exclusion of Skeene's Trial Testimony

Millan argues the trial court erred by excluding the testimony of his "star witness," Skeene, who was Millan's supervisor in the Parks department at the time of trial. The City sought to exclude Skeene's testimony in its motion in limine No. 2, in which it requested "an order precluding [Millan] or his counsel from mentioning, referring to, or introducing at trial any evidence from [Millan]'s current supervisor and coworkers [George Salsgiver, Johnny Hernandez, and Tom Croom] in the Parks and Recreation Department related to events which did not occur in [Millan]'s current supervisor and coworkers' presence when [Millan] worked in the Public Works Department."

In the motion, the City explained neither Skeene nor Millan's current coworkers in the Parks department had ever been supervised by Jaime or Warren and ever worked with Millan in Public Works. The City argued neither Skeene nor the four coworkers had personal knowledge (within the meaning of Evidence Code section 702) of any event alleged to have occurred when Millan was working under Jaime's and Warren's supervision in Public Works. Therefore, the City contended, the court should preclude testimony as to what those witnesses heard or believed about Millan's experiences while working for Public Works as lacking in foundation. Millan opposed

20

motion in limine No. 2, arguing the coworkers at issue had personal knowledge of retaliatory conduct by Jaime.

The trial court granted the motion, stating: "The four witnesses who were not supervised by plaintiff's supervisors and did not work with plaintiff, those witnesses will be excluded." The court rejected the argument Skeene should be allowed to testify he witnessed Millan and others excessively sandbagging in the City Yard, pointing out it was undisputed sandbagging was part of the Public Works maintenance worker's job. Furthermore, the court explained, Parks employees who had not been involved in Public Works job assignments, should not be allowed to give "their sort of basically uneducated opinion of whether [the extent of sandbagging they witnessed was] fair or not." The court concluded: "I don't think the probative value of the evidence you're proffering is worth very much at all. What if I was just some random . . . if I drive on the 405 freeway and I see an individual picking up trash every day on the chain gang on the side of the freeway, picking up trash as part of their labor, you're saying that I could just pick that driver and have that person come to court and say, 'I saw that person picking up trash five days a week?' What probative value does that have?" The court reiterated Parks employees should not be allowed to opine about the types and amounts of work assigned to particular Public Works employees solely based on their casual observations.

The trial court, however, invited Millan to make a motion for reconsideration of its ruling during the trial. Millan did move for reconsideration near the end of his case-in-chief. With the exception of allowing certain impeachment evidence to be introduced, the court denied the motion for reconsideration.

In his opening brief, Millan abandons his challenge to the court's ruling on motion in limine No. 2 as to all witnesses except Skeene. Millan argues the trial court erred by refusing to allow Skeene to testify: (1) "When someone does something in [Public Works] that the supervision doesn't like, they usually will take them out of their area or give them duties that are undesirable like sandbagging or things like that, just

21

given the crap work"; (2) he saw Millan on an ongoing basis from 2014–2017, and other Public Works employees at other times, performing undesirable work including excessive sandbagging in the City Yard; (3) he found Millan's performance improvement plan not well-founded; and (4) he has heard Jaime yell at his maintenance workers, once threaten to fight his lead, and generally "rule by fear and intimidation."  The trial court did not abuse its discretion by excluding Skeene's testimony.

As discussed *ante*, it appears to be undisputed that, at all relevant times, Skeene worked in Parks, not Public Works, and did not have personal knowledge of Millan's or any other Public Works' employee's performance in Public Works.  Skeene testified at his deposition he did not know whether Millan had been treated differently in terms of how he was disciplined.

What Skeene considered "undesirable work," such as filling sandbags and removing tree stumps, is part of a Public Works maintenance worker's job.  That Millan filled sandbags in the City Yard was not disputed; Skeene's testimony that he observed Millan and certain other employees filling sandbags to a greater extent than he saw other workers perform that task is not probative.  Even if Skeene's testimony on this point had any probative value, it is unclear when Skeene observed Millan filling sandbags, and in particular, whether his observations occurred after the filing of the DFEH complaint and/or the Cal/OSHA complaint.[6]

---

[6] Skeene also did not have personal knowledge regarding when Public Works employees would be pulled out of their areas to work elsewhere.  He testified he concluded workers would be pulled out of their areas as a form of retaliation or discipline based on what "[t]hey would say, or somebody else would say [and] [y]ou would notice they weren't in their area.  You would see them covering other areas, doing other things."  Skeene testified at his deposition he never saw Millan digging stumps on his own and did not often observe him working in general because Millan would be out in the field and Skeene did not supervise him.  Skeene's impressions of Public Works' operations in this regard are largely based on what he happened to observe in the City Yard or his "just know[ing] the general consensus of what's been going on."

22

It is also undisputed Millan was taken off the performance improvement plan within a few months after he transferred from Public Works to Parks. Nothing in the record suggests Skeene would be qualified to opine on whether Millan's performance in Public Works warranted putting him on a performance improvement plan in the first place. Millan's satisfactory performance in his new role in Parks is neither in dispute nor relevant to the issue presented here—whether he suffered an adverse employment action *because* he filed the DFEH charge and/or the Cal/OSHA charge. Millan therefore fails to show Skeene's testimony should have been admitted to impeach the validity of Millan's performance improvement plan in Public Works.

Furthermore, Skeene testified in his deposition he did not recall ever hearing Jaime yell at Millan, although he heard Jaime yell at other Public Works employees. While Skeene observed Millan was involved in closed door meetings in Jaime's office, he did not know the specifics of what occurred at such meetings. Again, Skeene's testimony on this point was not particularly probative of the issues presented at trial.

Millan argues Skeene would have testified Jaime ruled by fear and intimidation to prove the City's retaliatory intent in taking adverse employment actions against Millan. While Skeene observed Jaime to supervise in a gruff and intimidating way, the record does not show he had any personal knowledge that that general gruffness had any correlation to a retaliatory intent with regard to Millan or any other Public Works employee. In his deposition, Skeene explained his impression Jaime had tendencies to retaliate against his subordinates for anything and everything was largely based on rumors and hearsay combined with his observations of workers performing physically demanding work. That Skeene once observed Jaime, on an unspecified date, threaten to fight his lead worker at the time without any further information is not probative of Jaime's retaliatory intent to support a finding Millan suffered adverse employment actions because he filed his complaints.

23

The trial court, therefore, did not abuse its discretion by excluding Skeene from testifying at trial.

4.

Exclusion of Me-too Evidence

In its motion in limine No. 8, the City moved to exclude evidence of other maintenance workers' alleged experiences of discrimination or harassment in Public Works. The City argued such evidence was irrelevant to Millan's retaliation claims.

In *McCoy, supra*, 216 Cal.App.4th at pages 296–297, the court explained: "[T]he relevance of evidence of discrimination or harassment by defendants against nonparties is 'fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.' [Citations.] We conclude the court was within its discretion to find evidence of discrimination and harassment based on race and gender had little relation to the surviving retaliation claim, and was excludable on that ground." The *McCoy* court also stated: "[I]f . . . other employees faced similar retaliation to that alleged by appellant . . . , it cannot be said that such evidence could be of no relevance to appellant's retaliation claim. If this 'me-too evidence' was probative of respondents' intent in retaliating against appellant, as alleged, it should have been admitted . . . ." (*Id.* at p. 297.)

a. Trevino

At the hearing on the motion in limine, Millan's counsel stated he wished to present evidence Trevino had complained to the director of Public Works about the "abuse in general, retaliation" he experienced in the form of "bad work assignments" and verbal abuse after he tried to leave Public Works. Millan did not suggest Trevino ever suffered retaliation for opposing unlawful discrimination or harassment under FEHA or disclosing a violation of law within the meaning of Labor Code section 1102.5. The trial court did not abuse its discretion by concluding the evidence regarding Trevino's

24

experiences of retaliation were not sufficiently similar to Millan's retaliation claims so as to be probative of whether Millan was retaliated against for filing complaints with government entities. (See *Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55, 89 ["'Me too' evidence is never admissible to prove an employer's propensity to harass"].)

b. Herrera, Rangel, and Villalpando

Millan also sought to present evidence Herrera, Rangel, and Villalpando had each complained to Jaime about "safety issues" related to storm drains, and thereafter "experienced retaliation" that included receiving bad work assignments. Stating it "[had] some difficulty with this one," the trial court granted the motion, explaining: "Because in your case, the retaliation occurs before the Cal/OSHA complaint is made, those other people are all making complaints not relating to being part of a protected category or seeking protection from unwanted discrimination. Instead, they're making Cal/OSHA related violations. [¶] I find that there's sufficient differentiation between the case at issue here as well as the proffer of evidence you set forth for the additional witnesses that you were intending to call. And as a result, I'm granting the motion."

In reviewing the trial court's ruling for an abuse of discretion, we first observe that unlike Millan, Herrera, Rangel, and Villalpando did not claim to experience retaliation for filing a DFEH complaint or otherwise opposing discrimination or harassment in violation of FEHA. (See *Pinter-Brown v. Regents of University of California, supra*, 48 Cal.App.5th at p. 89 ["'me too' evidence can be admissible only to prove intent and motive, among other things, with respect to the plaintiff's own protected class"].) None of those three workers filed a DFEH complaint or a complaint with Cal/OSHA.

Like Millan, those three workers claimed to have been retaliated against after complaining about Cal/OSHA-type safety violations regarding Public Works'

25

procedures for cleaning storm drains. In Millan's motion for reconsideration of motion in limine No. 8, he explained De Herrera and Rangel, like Millan, specifically challenged those procedures for failing to check for air quality.

Assuming the trial court erred by failing to admit me-too evidence regarding Herrera, Rangel, and Villalpando, we conclude any error would not be prejudicial as a matter of law. A judgment shall not be reversed by reason of the erroneous exclusion of evidence unless the error "resulted in a miscarriage of justice." (Evid. Code, § 354.) A miscarriage of justice exists only when "'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

Such evidence would have only been relevant to Millan's claim he was retaliated against for filing the Cal/OSHA complaint—a complaint he filed anonymously. The jury was presented with extensive evidence supporting Millan's argument he suffered various adverse employment actions in retaliation for having filed the DFEH complaint, which was filed a year before the Cal/OSHA complaint. Nevertheless, while the jury found that Millan suffered adverse employment actions, it did not find his filing of the DFEH complaint to be a substantial motivating factor for such action. It is not reasonably probable the jury would have found Millan's filing of the Cal/OSHA complaint to have been a contributing factor to the adverse employment actions that followed that filing, particularly given Millan's status on a performance improvement plan at that time.

We find no prejudicial error.

5.

Limits on Impeachment, Rehabilitation, and Refreshing the Recollection of Witnesses

Millan argues the trial court abused its discretion by limiting Millan's ability to impeach and rehabilitate the testimony of certain trial witnesses and by refusing to allow him to refresh the recollection of another. First, Millan argues the trial court

26

erred by excluding Villalpando's testimony Jaime had questioned Villalpando and gave him a hard time when he wanted to transfer to the Parks department. Millan intended to offer such testimony to impeach Jaime's testimony he did not care whether Public Works employees sought such a transfer. The issue presented in this case, however, is whether Millan was retaliated for filing complaints, not for transferring or attempting to transfer out of Public Works. Villalpando's proffered impeachment testimony, therefore, had minimal, if any, relevance. The trial court did not abuse its discretion by excluding it.

Second, Public Works employees Silvano Garcia and Wilfredo Cruz testified they had not observed any retaliatory conduct by Jaime against Millan. Millan argues the trial court should have permitted him to challenge their credibility on this point by introducing Villalpando's testimony he once heard Jaime tell Garcia and Cruz they owed Jaime their jobs and witnessed them respond to that statement by hanging their heads and voicing their agreement with him.

The trial court rejected Millan's argument regarding Villalpando's testimony in its ruling denying the motion for a new trial: "Plaintiff attempted to impeach the testimony of Roldan Serrano, Silvano Garcia and Wilfredo Cruz with the testimony of another witness, Cesar Villalpando. Plaintiff fails to satisfactorily explain how the [in]clusion of Mr. Villalpando's purported evidence would have impeached Mr. Serrano, Mr. Garcia and Mr. Cruz and even if it somehow did, how it was error to exclude such evidence. The issue was briefed in the motion for reconsideration . . . at which Plaintiff proffered that Mr. Villalpando heard Mr. Jaime tell Mr. Serrano, Mr. Garcia and Mr. Cruz that all three of them owed their jobs to Mr. Jaime. However, such multiple layered hearsay testimony had little to no impeachment or relevance value and was properly excluded. (See *Rosenbloom v. Western Auto Transports* (1953) 120 Cal.App.2d 335, 342 ('Any claimed impeaching testimony must be relevant and material to the issue being tried and inconsistent with the prior statement.')). [¶] Moreover, nothing prevented Plaintiff from inquiring of those three individuals—Mr. Serrano, Mr.

27

Garcia, and Mr. Cruz—on cross-examination, about the fact that Mr. Jaime was their supervisor and arguing during summation that their credibility should therefore be questioned, which to some extent Plaintiff did do."

We agree with the trial court's reasoning and conclude the trial court did not abuse its discretion in excluding Villalpando's testimony on this point.

Millan also argues the trial court erred by barring his counsel's efforts to rehabilitate the testimony of De Hererra. De Herrera testified he overheard Jaime make sexual comments in Millan's presence and otherwise. On cross-examination, the City's counsel asked De Herrera whether his employment with the City had been terminated in 2013 for misuse of city equipment and for lying to his supervisor. De Herrera responded he had not been terminated but instead quit and also denied having lied. On redirect examination, Millan's counsel asked De Herrera if the employment termination referred to by the City's counsel had constituted a retaliatory act against him. The court sustained the City's counsel's objection to that question.

Millan's counsel's rather leading question on redirect examination did not constitute an effort to rehabilitate De Herrera—there was nothing to rehabilitate as De Herrera denied having been terminated for misuse of city equipment and for lying. Therefore, the trial court did not abuse its discretion by precluding counsel's rehabilitation effort.

Finally, Millan argues the trial court erred by refusing to allow counsel to refresh the recollection of Johnny Hernandez who, apparently to the surprise of Millan's counsel, testified he had *not* observed Jaime yell at Millan. Millan's counsel asked Hernandez whether it would refresh his recollection if he were to listen to a prior audio recording when the trial court interjected, "He didn't say he needs his memory refreshed. He said he never saw it." When asked if he recalled telling someone at the City he heard Jaime chew out Millan, Hernandez responded, "Not that I can remember." Millan's

28

counsel again asked to refresh Hernandez's recollection by having him listen to an audio recording of a statement he had made years earlier. The trial court denied the request.

The trial court explained there was nothing in Hernandez's testimony to suggest Hernandez needed his memory refreshed. Even if we were to assume the court abused its discretion, Millan has failed to explain how it is reasonably probable he would have had a more favorable result at trial if the court had allowed counsel to refresh Hernandez's recollection and if thereafter Hernandez testified he had heard Jaime yell at Millan on an unspecified occasion for an unspecified reason. (See *Coral Farms, L.P. v. Mahony, supra*, 63 Cal.App.5th at p. 733 ["In short, the evidence at issue was essentially irrelevant. Thus, the trial court's alleged evidentiary errors are not arguably prejudicial"].)

6.

Evidence of the Substantive Allegations of the DFEH Complaint

Millan argues the trial court erred by excluding evidence of the substantive allegations of his DFEH complaint. He argues "[a]s a result, the jury was left without a tangible complaint. They were left without the context necessary to draw a causal connection between the complaint and alleged retaliation because of the complaint. They lacked the facts to infer motivation such as anger, fear, threat, or self-interest, not only on the part of Jamie and Warren, but on the part of coworkers who testified against Millan."

Millan raised this issue in his motion for new trial. In its ruling denying that motion, the trial court rejected Millan's argument, explaining:

"The basis of Plaintiff's argument is not that the Court's ruling was erroneous, but more that without the underlying allegations which Plaintiff does not dispute are time barred, the jury was unable to 'connect with or care about' the DFEH complaint. 'They lacked the facts to infer motivation, such as anger, fear, threat, or self-interest, not only on the part of Superintendent Jaime and Supervisor Warren, but on the

29

part of Public Works employees, such as Roldan Serrano, Jesus Lopez, Silvano Garcia, and Wilfredo Cruz . . .'. . . .

"Unfortunately, Plaintiff's arguments are again without merit. First, the Court allowed evidence that the 2015 DFEH complaint was filed as well as the entity to which Plaintiff complained and the respondent's name. Moreover, in litigating this issue during the motions in limine, the Court inquired of Plaintiff's counsel, 'the corpus of your case is, your client is being retaliated against for making a DFEH complaint. And it doesn't matter that it was meritorious [or] it was not meritorious. The fact that he made the complaint alone was the impetus for the retaliation. Have I misunderstood the theory of the case?' Plaintiff's counsel responded that the Court properly understood the theory of the case. . . .

"Plaintiff cites to no authority, and the Court is unaware of any, that stands for the proposition that otherwise time-barred and irrelevant evidence is somehow admissible so a jury can 'connect' and 'care'. There was no error and, in any event, the issue was thoroughly briefed, argued, and preserved. [¶] As a final point, even if any of these so-called errors of law occurred, Plaintiff fails to demonstrate prejudice and, on this ground as well, Plaintiff's arguments fail."

Millan does not address any of the trial court's stated reasons for excluding evidence of the underlying allegations in the DFEH complaint in his appellate briefs or explain how the exclusion of those allegations constitute an abuse of discretion. Furthermore, Millan fails to explain how on this record it is reasonably probable the jury would have found in Millan's favor had the excluded allegations been admitted at trial. We find no error.

30

7.

Exclusion of Evidence of Negligent Acts and Omissions Leading Up to Retaliation

Millan argues the trial court abused its discretion by excluding evidence relevant to Millan's failure to prevent retaliation claim.[7] For the reasons we have discussed *ante*, Millan has failed to show the judgment in favor of the City on Millan's retaliation claims should be reversed due to prejudicial evidentiary error. Millan's claim the City failed to prevent retaliation was dependent upon the occurrence of actual retaliation. (See *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1021 [An actionable claim for failure to prevent discrimination under Government Code section 12940, subdivision (k) is dependent upon a claim of actual discrimination]; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 ["'[T]here's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen, for not having a policy to prevent discrimination when no discrimination occurred . . . .' Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented"].)

Because the jury did not find the City retaliated against Millan, Millan's claim the City failed to prevent retaliation claim fails. Any error in excluding evidence

---

[7] In his opening brief, Millan argues: "The trial court excluded evidence of the City's negligent acts and omissions leading up to the alleged retaliation against Millan, even though this evidence supported Millan's failure to prevent retaliation claim. . . . This included damning evidence about Superintendent Jaime and supervisor Warren gathered by Assistant City Manager Christian during an investigation in 2014/2015 . . . , a report about the investigation, and . . . audio recordings of interviews taken during this investigation . . . [which] were filled with testimony by City employees documenting a history of aggression by Jaime and Warren and the climate of fear, division and intimidation that was created. . . . But the City failed to act upon this testimony and discipline its supervisors. . . . The City's conduct was grossly negligent and constituted a failure to take reasonable steps that would have prevented the highly foreseeable retaliation against Millan from occurring."

31

showing the City failed to take steps to ensure unlawful retaliation did not occur is therefore harmless.

## II.

### CONTENTIONS OF JUDICIAL MISCONDUCT

Millan also contends the trial court engaged in judicial misconduct.  In his opening brief, Millan argues on two occasions, the court screamed at Millan's representatives in front of the jury.  He contends his argument is "highly credible" given the trial court's comments to counsel throughout trial he believes were inappropriate.  We have reviewed the record and have found no instance—individually or cumulatively—of error.

Our review of the record shows Millan did not ever object to any alleged screaming by the trial court or make any statement on the record suggesting the trial judge ever raised his voice in the courtroom.  As a general rule, a claim of judicial misconduct is not preserved for appellate review if no objections were made on that ground at trial.  (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237; see *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 103 ["The rule is well settled that when . . . a party or his counsel becomes aware of facts constituting misconduct or irregularity in the proceedings . . . , he must promptly bring such matters to the attention of the court, if he desires to object to it, or he will be deemed to have waived the point"].)  Nothing in the record supports Millan's argument that asserting objections would have been futile.

In ruling on the motion for a new trial and rejecting, inter alia, Millan's argument the trial court engaged in misconduct, the trial judge denied ever screaming at Millan's representatives, stating:

"Preliminarily, the Court does not scream, nor yell.  During a trial, it sometimes will become necessary for the Court to intervene and issue a gentle re-direction.  Sometimes, the Court must issue a stern admonishment.  These actions are well within a court's discretion.  Regardless, the Court does not yell, nor scream.  In

32

particular, the Court does not recall yelling or screaming at anyone during this trial, nor is it the practice of this Court to ever scream or yell while Court is in session.

"The Court is required to maintain the dignity and proper decorum of the Court, and to ensure that the parties and trial are proceeding in an efficient manner. A judge has the power, and the duty to provide for the orderly conduct of the trial. (See Code Civ. Proc. § 128[, subd.] (a)(3)). To accomplish this, the judge may regulate the order of proof (Evid. Code § 320), control the interrogation of witnesses (Evid. Code § 765[, subd.] (a)), and exclude evidence if its probative value is substantially outweighed by the probability that its admission will either (1) consume an undue amount of time, or (2) create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury (Evid. Code § 352).

"Consider the Court of Appeal's observations in *People v. Jackson* (1971) 18 Cal.App.3d 504, 509, 'the administration of justice would greatly benefit if more trial judges made use of their inherent powers as codified in [Evidence] Code § 352, to control, and if necessary, terminate repetitious, time consuming and irrelevant testimony.' There, the Court of Appeal stated that the trial judge 'must alertly supervise' the proceedings and that because of the litigation explosion, 'the concept of a kindly, benign trial judge who listens passively and patiently while the lawyers try their cases without [the judge's] interference is no longer valid—if it ever was.'

"Here, the parties declined to submit the entire trial transcript to the Court. One of the unfortunate consequences of that decision is that the parties and the Court are denied the opportunity to view the entire trial in context which in the Court's recollection would demonstrate that the Court actually exercised significant restraint and allowed the parties and their lawyers to try their respective cases without interference and within the boundaries of the law as the Court viewed it. However, to directly address Plaintiff's broader contention, Plaintiff is incorrect in his characterization. The Court does not 'scream' nor 'yell' and did not during this trial."

33

In opposition to Millan's motion for a new trial, the City's counsel submitted a declaration stating: "The Declarants make a number of claims in support of Plaintiff's Motion that are not grounded in fact. First, each of the Declarants alleges that [the trial judge] 'yelled' or 'screamed' at them at various times during trial . . . . These allegations are simply untrue. At no point during the trial did [the trial judge] engage in what I would characterize as 'yelling' or 'screaming,' let alone engage in such conduct toward Plaintiff or his representatives, nor did the Court ever have an 'explosion with anger' toward Plaintiff's counsel or anyone else. There were times that [the trial judge] did raise his voice, but no more so than anyone else during trial due to the muffling caused by the masks we were all required to wear during the course of the trial as required by state and local health orders due to the COVID-19 pandemic."

In his opening brief, Millan argues that while the City has submitted declarations denying his allegations, "strong corroboration for Millan's allegations lies in the reporter's transcript of the trial proceedings." Millan cites portions of the reporter's transcript where he claims the trial court (1) referred to certain actions of Millan's trial counsel as "'cute attempts,'" (2) falsely accused Millan's trial counsel of thinking the trial court was "intellectually 'dense'"; and (3) told Millan's trial counsel he was "'singularly difficult.'"

Millan argued in his motion for a new trial the first two comments by the trial court constituted an irregularity in the trial within the meaning of section 657, subdivision (1) of the Code of Civil Procedure. The trial court addressed Millan's argument in its ruling denying that motion:

"Plaintiff's counsel also complains that the following statements by the Court constitute an irregularity: 'I don't appreciate your cute attempts to try and like backdoor information either in the trial or through here. Do I look like I am dense or like unable to comprehend the issues that are coming up here? I said we would table the issue and return to it. Okay?' and 'you really are getting frustrating, Mr. Kim.'. . . Again,

34

these comments were made outside the presence of the jury in the context of settling the jury instructions.

"Further, although not set forth in the transcript excerpts by either side, the Court's recollection is that the first comment about being 'cute' is a reference in part to the prior session in front of the jury when Plaintiff's counsel intentionally and willfully solicited evidence that the Court previously excluded. In addition, the Court noticed during the jury instruction conference that despite the fact that the Court on multiple occasions indicated it would table the issue and return to it, Plaintiff attempted to re-argue the issue, *repeatedly*. While the Court does not view the Court's comments as personal attacks on Plaintiff's counsel, as opposed to attempts to have counsel focus on the questions that the Court was asking and not argue in a repetitive fashion, it is undisputed that these comments were all made outside the presence of the jury and Plaintiff fails to demonstrate how these comments warrant the granting of a new trial."

Millan does not address, much less dispute, the trial court's description of the context and intent of the court's use of the words "cute" and "dense" during the trial.[8] Neither the court's description, nor anything else in the record, supports Millan's contention the court's use of such words suggest the court had ever screamed at any member of Millan's legal team.

As to Millan's argument the trial court must have screamed at his representatives because the court told his counsel he was "singularly difficult," the record does not show the trial court ever used that phrase. The record cite provided by Millan on this point in his opening brief shows the trial court stated, as referenced in the portion

---

[8] The trial court's choice of words, "Do I look like I am dense" was unnecessary and unfortunate, but it is not enough, either alone or in combination with similar instances in this case, to show the trial judge was biased against Millan or his counsel or otherwise engaged in prejudicial judicial misconduct.

35

of the trial court's ruling quoted *ante*, "You really are getting frustrating Mr. Kim."[9] In its ruling, the trial court explained the context of that statement and as discussed *ante*, Millan has not challenged the court's explanation. Needless to say, Millan has failed to substantiate his serious accusations the trial court engaged in misconduct and "corrupted the trial."

## DISPOSITION

The judgment is affirmed. Respondent to recover costs on appeal.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

---

[9] We would caution counsel when quoting the trial court in support of an argument of judicial misconduct to be more accurate.